**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 15-35358 |
| LB STEEL, LLC, | ) | |
| | ) | Honorable Janet S. Baer |
| Debtor. | ) | |

**DECLARATION OF MICHAEL GOICH IN SUPPORT OF
DEBTOR'S CHAPTER 11 PETITIONS AND FIRST MOTIONS**

I, Michael Goich, hereby declare as follows:

1. I am the President of LB Steel, LLC, the above-captioned debtor (the "<u>Debtor</u>" or "<u>LB Steel</u>") and have been employed by LB Steel since 2001.  In this capacity, I am familiar with LB Steel's operations, business affairs, books and records.  On October 18, 2015, LB Steel filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2. To enable LB Steel to minimize the adverse effects of the commencement of its Chapter 11 Case on its business, LB Steel has requested relief in several "first day" motions and other motions (each, a "<u>First Motion</u>") described below.[1]  I am familiar with the contents of each First Motion and I believe that the relief sought in each First Motion: (a) is necessary to enable LB Steel to operate in Chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful result in the Chapter 11 Case; and (c) is in the best interests of LB Steel and its creditors.

3. The representations set forth in this declaration are based upon my personal knowledge, information learned from my review of relevant documents and information supplied to me by other members of LB Steel's management.  I am authorized to submit this Declaration

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Motion.

on behalf of LB Steel, and, if called upon to testify, I could and would testify competently to the facts set forth in it.

## I.  DESCRIPTION OF THE DEBTOR'S BACKGROUND AND BUSINESS OPERATIONS

4. LB Steel is a distributor of non-prime steel plate and steel parts for the construction, agricultural, and mining equipment and power generation industries, offering outsourced machining, fabricating, burning and assembly services to its customers located throughout North America. LB Steel operates its business in three locations, which together constitute 450,000 square-feet of manufacturing facilities, including a machine shop, CNC machining centers and assembly areas, a fabrication facility and a burn shop. LB Steel's services include the following:

   a. Plate: LB Steel offers certified chemistry plate products in various shapes and sizes to accommodate part nesting requirements.

   b. Outsourced manufacturing: LB Steel manufactures parts and products according to customer's product specifications and demand. Related services include plate leveling, painting, oxy-fuel burning, and plasma/laser cutting.

   c. Fabrication and Welding: LB Steel processes metals into usable product such as the structural supports of buildings and other products.

   d. Counterweights: LB Steel produces counterweights used in the operation of equipment to hoist heavy loads, such as elevators and cranes.

   e. Assembly: LB Steel offers electrical, hydraulic pneumatic and mechanical assembly services.

5. LB Steel is headquartered in Harvey, Illinois, where it currently employs 232 persons. LB Steel also employs an additional 80 people in its two other locations in Topeka, Kansas and Warren, Ohio. LB Steel's workforce consist of approximately 241 union employees and 71 non-union employees. LB Steel's unionized employees at its three locations are subject to collective bargaining agreements with the Shopmen's Local Union # 473 of the International

Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, Sheet Metal Air, Rail, & Transportation Workers Union Local #2, and United Steel Workers.

6. LB Steel was organized as GL Steel Products LLC, a limited liability company, on December 18, 2001 in Delaware. LB Steel changed its name to LB Steel on January 4, 2002. 76% of the membership interest in LB Steel is held by LB Industries, Inc., an Illinois corporation. Goich & Goich LLC, an Illinois limited liability company, and Goich Family Trust, respectively own the remaining 19% and 5% of LB Steel.

## Pre-Petition Capital Structure and Financial Position

a. **Senior Creditor - MB Financial, N.A.**

7. On June 18, 2014, LB Steel entered into a Loan and Security Agreement with MB Financial, N.A. ("MB Financial"), pursuant to which it has (a) a $15,000,000 line of credit expiring in June 2016 and (b) a term loan in the original principal amount of $2,400,000 which expires in June 2018. LB Steel's debt obligations to MB Financial are collateralized by substantially all of its assets. LB Steel has made monthly consecutive $50,000 repayments of the outstanding principal balance of the term loan since July 15, 2014.

b. **Subordinated Creditors - LB Industries, Inc. and Michael & Mara Goich**

8. LB Steel has outstanding subordinated loans evidenced by a promissory note in the principal amount of $3,550,000 executed on May 19, 2011 in favor of LB Industries, Inc., and a promissory note in the principal amount of $400,000 executed on May 19, 2011 in favor of myself and my wife Mara Goich. Both promissory notes are subordinated to loans of MB Financial pursuant to a written Subordination Agreement dated as of June 18, 2014.

**Events Leading to Chapter 11 Filing**

    a.    **Negative Industry Condition**

9. LB Steel's business has been adversely impacted by the multi-year downturn in the mining and extraction, oil and gas and other heavy industries in which LB Steel's customers operate. Additionally, commodity prices for steel, which is central to LB Steel's business, have declined. As a result, over the past three years, LB Steel's revenue and profit have declined. In 2012, LB Steel had revenue in excess of $118 million and an EBIDT in excess of $8 million. By 2014, LB Steel's revenue had declined to $78 million which resulted in a loss of $2.8 million. LB Steel's financial outlook for 2015 is no better. Its decline in revenue continues and, despite significant headcount reductions and other cuts, LB Steel continues to operate at a loss. Operating results are also negatively impacted by the costs of litigation with Walsh Construction Company ("Walsh").

    b.    **Walsh Litigation**

10. In January 2003, the City of Chicago (the "City") and Walsh entered into a contract for the construction of a canopy and curtain wall at the O'Hare International Airport. Walsh entered into a subcontract with Carlo Steel Corporation for the fabrication and installation of the steel and curtain wall portion of Walsh's contract. Carlo, in turn, subcontracted with LB Steel for the fabrication and shop welding of the steel supports for the canopies. LB Steel retained Cal Testing Services, Inc. (d/b/a Calumet Testing Services) ("CT") to conduct ultrasonic testing on the full penetration welds performed by LB Steel in connection with its subcontract.

11. In December 2004, the City identified defects in the canopy and curtain wall. A series of lawsuits among the parties involved in the Project followed. In April 2007, the City

filed suit against Walsh (the "Walsh Litigation").[2] The Walsh Litigation was consolidated with two other lawsuits initiated by LB Steel in 2004 and 2008 to recover the amount of contract payments withheld while the issues were being investigated.[3] During 2012 and 2013, the City, Walsh and CT entered into settlement agreements which left Walsh's claim against LB Steel for breach of contract and LB Steel's contract, bond, and lien claims to recover the withheld payments unresolved.

12. On August 24, 2015, a bench trial commenced before the Honorable John C. Griffin in the Circuit Court of Cook County. On October 14, 2015, Judge Griffin issued a judgment in favor of Walsh and against LB Steel in the amount of $27,500,000 for breach of contract. Judge Griffin also found that LB Steel was entitled to a credit for $8,312,696 based on its contract, bond, and lien claims, resulting in a net judgment in favor of Walsh against LB Steel in the amount of $19,187,304.

    c. **Financial Hardship**

13. As a result of expending significant amounts to defend the Walsh Litigation and the threat of Walsh enforcing its judgment, LB Steel determined that it was unable to continue its business operations without filing for relief under Chapter 11 of the Bankruptcy Code. LB Steel's management has concluded that the most effective way to preserve the company's working capital to meet its obligations, and continue its business as going concerns is to sell the company's assets. LB Steel anticipates conducting an asset sale auction and selling the business to the highest and best bidder.

---

[2] *City of Chicago v. Murphy/Jahn, Inc. Architects, et al.,* Case No. 07L003886.

[3] *LB Steel, LLC, et al., v. Carlo Steel Corporation, et al.*, Case No. 05CH02675 and *LB Steel, LLC, et al.,*

## II. FIRST MOTIONS

### a. DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO USE CASH COLLATERAL AND OTHER COLLATERAL AND GRANTING LENDER ADEQUATE PROTECTION PURSUANT TO SECTIONS 361 AND 363 OF THE BANKRUPTCY CODE AND TO SCHEDULE A FINAL HEARING

14.   LB Steel seeks the entry of an interim cash collateral order authorizing it to use certain cash collateral of MB Financial, which consists of revenue generated from the operation of LB Steel's business and petty cash expended in its business.  It is critical for LB Steel to use such cash collateral to finance its ongoing post-petition business operations until it completes a sale of its assets and/or confirms a plan of reorganization.  Absent the use of cash collateral, LB Steel will be forced to close its business, in which case its assets and its bankruptcy estate will be irreparably harmed to the detriment of LB Steel and all of its creditors, and will result in significant job losses.

15.   The proposed adequate protection LB Steel expects to provide to MB Financial is replacement liens to the extent and priority of MB Financial's pre-petition liens and the continued operation and maintenance of LB Steel's business, which will preserve the value of MB Financial's collateral.

16.   Without the continued access to use the cash collateral, LB Steel will not have sufficient available working capital to finance its ongoing post-petition business operations.  LB Steel represents that use of its cash collateral will allow it to operate as a going concern until it completes a sale of substantially all of its assets and/or confirms a plan of reorganization, which will maximize the value of the estate for all creditors.  In the absence of authorization of the use of the cash collateral, LB Steel cannot continue the operation of its business, causing immediate and irreparable harm to its assets, creditors and bankruptcy estate.  LB Steel's proposed use of

---

*v. Cal Testing Services, Inc. d/b/a Calumet Testing Services,* Case No. 08L06675.

such cash collateral is fair and reasonable and reflects LB Steel's exercise of prudent business judgment consistent with its fiduciary duties. Further, LB Steel believes that the proposed adequate protection for MB Financial, including the continued operation and maintenance of its business and offering MB Financial replacement liens, will preserve the value of MB Financial's collateral.

        b.    **DEBTOR'S MOTION FOR ORDER PURSUANT TO 11 U.S.C. §§ 345 AND 363 (A) AUTHORIZING CONTINUED USE AND MAINTENANCE OF EXISTING BANK ACCOUNTS AND BUSINESS FORMS, AND (B) WAIVING INVESTMENT AND DEPOSIT REQUIREMENTS**

17.    LB Steel maintains four bank accounts with MB Financial Bank, three of which are controlled disbursement/lockbox accounts and one is a savings account. LB Steel also maintains one checking account at Capital City Bank. Capital City Bank is an FDIC-insured depository and LB Steel maintains significantly less than the FDIC-insured limit in its account at Capital City Bank.

18.    LB Steel's transition into chapter 11 will be enhanced by its ability to maintain its bank accounts without interruption. In addition, it would be impractical and inefficient for LB Steel to open new accounts. The bank accounts include the necessary accounting controls to enable LB Steel to trace funds and ensure that all transactions are adequately documented and readily ascertainable. LB Steel will continue to maintain records reflecting all transfers of funds.

19.    The operation of LB Steel's business requires continuation of the bank accounts during the Chapter 11 Case. Opening new bank accounts would be expensive, would create unnecessary administrative burdens and would be disruptive to LB Steel's business operations. Consequently, maintenance of the existing bank accounts is in the best interests of all creditors and other interested parties.

20. LB Steel requests that the Court authorize and direct its banks to continue to administer the bank accounts as they were maintained prior to the petition date, without interruption and in the ordinary course of business, and to pay any and all checks, drafts, wires or automated clearing house transfers issued on the bank accounts on account of any claims arising on or after the petition date so long as sufficient funds are in the bank accounts.

    c. **DEBTOR'S MOTION FOR AUTHORITY TO (A) PAY PREPETITION EMPLOYEE OBLIGATIONS, (B) CONTINUE ADMINISTRATION OF EMPLOYEE BENEFIT PLANS, AND (C) DIRECT ALL BANKS TO HONOR PREPETITION CHECKS FOR PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS**

21. In order to minimize the personal hardship LB Steel's employees would suffer if their employment-related obligations were not paid when due, and to maintain morale and an essential workforce during this critical time, LB Steel seeks authority to pay its prepetition employee obligations, including wages and benefits, in the ordinary course of business. LB Steel's employee obligations and the benefits that it provides to its employees are described as follows:

22. LB Steel is obligated to fund all employee payroll, salaries, wages, earned incentives and expense reimbursements. Its Topeka employees are paid weekly on Friday for the proceeding Monday through Sunday and LB Steel's gross employee payroll for its Topeka location for a single pay period totals approximately $50,000. LB Steel's Warren employees are paid weekly on Friday for the proceeding Monday through Sunday and its gross employee payroll for its Warren location for a single pay period totals approximately $15,000. LB Steel's Harvey unionized employees are paid weekly on Friday for the proceeding Monday through Sunday and its gross unionized employee payroll for its Harvey location for a single pay period totals approximately $150,000. LB Steel's Harvey non-unionized employees are paid bi-

monthly and its gross non-unionized employee payroll for its Harvey location for a single pay period totals approximately $150,000. LB Steel maintains two employee earned incentive programs: (a) the "Keyman" executive incentive program that is based on a formula of sales and net income, which has not been paid in several years based on LB Steel's financial performance and for which it does not plan to pay absent further Court approval; and (b) a discretionary year-end incentive available to non-Keyman employees.

23. The next date on which employee payroll is scheduled to be paid for the Topeka and Warren locations is October 23, 2015. The next dates on which employee payroll is scheduled to be paid non-unionized and unionized employees at the Harvey location are October 30 and October 23, 2015, respectively. LB Steel has paid all amounts due and payable to its employees of the Petition Date. As of the Petition Date, LB Steel estimates that the aggregate amount of earned, but unpaid, Employee Payroll is approximately $210,000.

24. In the ordinary course of employment, LB Steel's workforce earns paid vacation days. LB Steel requests that all employees be authorized to use such accrued paid vacation days in the ordinary course of business, pursuant to its paid vacation policies in effect as of the petition date. The employees at LB Steel's Topeka, Warren and Harvey locations have accrued paid vacation in the approximate amounts of $45,000, $25,000 and $160,000, respectively.

25. LB Steel is responsible for funding a number of different employee benefit plans. For LB Steel's Topeka and Harvey Employees, it pays approximately $27,000 and $172,000, respectively, in gross premiums per month to fund health benefits, including optional dental and vision plans for which such employees pay the premiums. For LB Steel's Warren employees, it pays $30,000 in gross premiums per month to fund health, dental and vision plans, which premiums are paid directly to the United Steelworkers Health and Welfare Fund for its unionized

employees at that location.

26. LB Steel also provides its employees with the following retirement plans: (a) a 401k plan available to all Illinois union employees at least 18 years old with at least one year of service, which plan providing matching funds of approximately $3,200 per month total for all of the participating employees; (b) a discretionary profit sharing plan available for the Topeka employees at least 21 years old with at least one year of service, to which LB Steel distributed $20,000 in 2013 for calendar year 2012 and $10,000 in 2014 for calendar year 2013, and which LB Steel plans to not contribute for calendar year 2014; and (c) a discretionary profit sharing plan available to the Warren employees and Harvey non-union employees at least 21 years old with at least one year of service, for which LB Steel distributed $100,000 in 2013 for calendar year 2012 and $26,000 in 2014 for calendar year 2013, and which LB Steel plans to not contribute for calendar year 2014.

27. LB Steel also offers to all employees life insurance and long-term disability plans for which it pays approximately $1,500 in gross premiums per month and optional short term disability plans for which any electing employee pays the premiums. LB Steel's employees make contributions for short term disability plans through payroll deductions.

28. LB Steel requests authority to continue all of its employee benefit plans in the ordinary course of business and pay its accrued prepetition obligations.

29. LB Steel maintains workers' compensation insurance through Kamm Insurance Group and Traveler's Insurance for its Topeka and Harvey locations and through the Ohio Bureau of Worker's Compensation for its Warren location. It is critical that LB Steel be permitted to continue its workers' compensation insurance because alternative arrangements for workers' compensation coverage would most certainly be more costly, and the failure to provide

coverage would subject LB Steel to severe penalties.  In addition, failure to pay workers' compensation claims may result in employee attempts to compel payment through litigation or similar means and jeopardize LB Steel's ability to conduct business.  Premiums for workers' compensation insurance are generally paid by LB Steel.  As of the petition date, LB Steel owes approximately $120,000 in prepetition premiums for its Topeka and Harvey locations and approximately $10,000 for its Warren location for workers' compensation insurance.

        d.    **DEBTOR'S MOTION FOR ENTRY OF ORDER AUTHORIZING THE DEBTOR TO PAY PREPETITION SALES, USE, AND OTHER TAX OBLIGATIONS**

    30.    LB Steel, in the ordinary course of business, is required to collect certain taxes in connection with the operation of its business and remit these taxes to the appropriate taxing authorities.  The process by which LB Steel remits such taxes varies depending on the nature of the tax at issue and the taxing authority to which the relevant tax is paid.  Prior to the petition date, LB Steel incurred tax obligations to federal, state, and local governmental agencies.  As of the petition date, certain taxes were outstanding and/or had accrued but were not yet due.

    31.    In addition, in the ordinary course of business LB Steel accrues state, local and federal employment and withholding taxes as wages are earned by its employees.  These employment and withholding taxes are calculated based on statutorily mandated percentages of earned wages.  Historically, LB Steel has timely paid all federal, state and local employment and withholding taxes to the relevant taxing authority through its payroll service, usually on a per pay period basis.

    32.    LB Steel seeks authority to pay these taxes that accrued prior to the petition date.

  e. **DEBTOR'S MOTION FOR ORDER GRANTING THE DEBTOR ADDITIONAL TIME TO FILE SCHEDULES AND STATEMENTS**

33. LB Steel has many creditors and interested parties. Given the size and the complexity of its business operations, the number of creditors, and the fact that certain prepetition invoices have not yet been received or entered into its financial accounting systems, LB Steel has begun, but not yet finished, compiling the information that will be required in order to complete its schedules of assets and liabilities and statement of financial affairs. Completing the schedules and statements will require the collection, review, and assembly of information from multiple sources. Therefore, LB Steel seeks an additional 30 days to filed its schedules and statements.

  f. **DEBTOR'S MOTION TO APPROVE PROCEDURES FOR INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR PROFESSIONALS AND OFFICIAL COMMITTEE MEMBERS**

34. LB Steel is seeking authorization to retain various professionals, including: (a) Perkins Coie LLP, as restructuring counsel; (b) Development Specialists, Inc., as financial advisor; and (c) an investment banker. To the extent necessary, LB Steel may seek to retain additional professionals during the Chapter 11 Case. Additionally, any Court-appointed committee likely will retain counsel and other professionals to represent them in connection with the Chapter 11 Case.

35. LB Steel proposes procedures to govern the payment of compensation and reimbursement of expenses of the professionals and committee members in the Chapter 11 Case, which include the monthly delivery of statements of services to LB Steel from each professional of committee member, the payment of 80 percent of the fees and 100 percent of the expenses identified in each statement that is not subject to an objection and the requirement that every 120 days, the professionals and committee members file with the Court an interim fee application in

compliance with the relevant provisions of the Bankruptcy Code, the Bankruptcy Rules and Local Rules.

36. LB Steel believes that its proposed compensation procedures will enable it to closely monitor costs of administration, avoid expending capital to pay large infrequent professional fees while maintaining a level of cash flow availability, and implement efficient management procedures. These procedures will allow the Court and key parties in interest to insure the reasonableness and necessity of the compensation and reimbursement sought pursuant to such procedures. LB Steel believes that the efficient administration of the Chapter 11 Case will be significantly aided by implementing its proposed compensation procedures.

    g. **DEBTOR'S MOTION FOR ORDER PURSUANT TO 11 U.S.C. § 366 (A) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING OR DISCONTINUING SERVICES ON ACCOUNT OF PREPETITION INVOICES AND (B) DEEMING THE UTILITY COMPANIES ADEQUATELY ASSURED OF PAYMENT**

37. In connection with the operation of its business, LB Steel obtained the following utility services for its Topeka location: (a) electricity service from Westar Energy; (b) natural gas service from Kansas Gas Service and Constellation Energy; and (c) water service from Topeka Water.

38. In connection with the operation of its business, LB Steel obtained the following utility services for its Harvey location: (a) electricity service from Direct Energy; (b) natural gas service from Center Point; and (c) water service from the City of Harvey.

39. In connection with the operation of its business, LB Steel obtained the following utility services for its Warren location: (a) electricity service from Ohio Edison; (b) natural gas service from Everflow Eastern Partners and Dominion East Ohio; and (c) water service from the City of Warren.

40. LB Steel seeks entry of an order prohibiting the utility companies from altering, refusing or discontinuing utility services on account of unpaid prepetition invoices or prepetition claims provided that LB Steel creates a segregated bank account for adequate assurance of payment of the utility companies under section 366(c)(1)(A)(v) of the Bankruptcy Code.

41. Uninterrupted utility service is critical to LB Steel's ability to maintain its business operations during the course of the Chapter 11 Case. LB Steel depends on utility services to power its manufacturing operations and provide HVAC and water services to maintain healthy conditions for its employees. Should the utility companies refuse or discontinue service, even for a brief period, LB Steel's operations would be disrupted, harming LB Steel's business and jeopardizing its efforts to successfully reorganize and/or sell its business as a going concern. It is therefore imperative that the utility services continue uninterrupted.

42. Although LB Steel anticipates that it will be able to satisfy all administrative expenses, including postpetition utility bills, on a current basis from the use of cash collateral, LB Steel further proposes to adequately assure the utility companies of future payment by creating a segregated bank account, the sole purpose of which is to adequately assure payment of the post-petition utilities services.

    h. **DEBTOR'S APPLICATION TO EMPLOY AND RETAIN PERKINS COIE LLP AS ITS BANKRUPTCY COUNSEL EFFECTIVE AS OF THE PETITION DATE**

43. Prior to the petition date, LB Steel retained Perkins Coie to advise it regarding its general business activities as well as in restructuring matters in general and preparation for its chapter 11 case. In this regard, Perkins Coie has performed legal work for LB Steel in connection with its business as well as its ongoing restructuring efforts, including, but not limited to, financing and creditor issues. As a result of representing LB Steel on such matters, Perkins

Coie has acquired extensive knowledge of LB Steel and its business and is familiar with LB Steel's capital structure, corporate structure, financing documents and other material agreements.

44. LB Steel believes that continued representation by Perkins Coie is critical to LB Steel's efforts to restructure its business because Perkins Coie is familiar with LB Steel's business and legal and financial affairs and, accordingly, is well-suited to guide LB Steel through the chapter 11 process. Further, Perkins Coie has vast experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under the Bankruptcy Code.

     i.    **DEBTOR'S APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF DEVELOPMENT SPECIALISTS, INC. AS FINANCIAL ADVISOR TO THE DEBTOR AS OF THE PETITION DATE**

45. Prior to the petition date, LB Steel retained Development Specialists, Inc. ("DSI") as its financial advisor and hired Patrick O'Malley, the Chief Financial Officer of DSI, as LB Steel's Chief Restructuring Officer.

46. LB Steel seeks to retain DSI because for the last 40 years, DSI has been a leading financial advisor to financially troubled businesses. DSI has substantial experience with turnaround consulting, forensic and litigation accounting, and corporate finance and substantial experience in the sale of assets in chapter 11 cases. LB Steel believes that DSI is well qualified to advise it in this Chapter 11 Case.

47. By assisting LB Steel with the filing of its Chapter 11 Case and as a result of DSI's prepetition advice to LB Steel, DSI has become familiar with LB Steel's business and financial issues that will have to be addressed in this Chapter 11 Case. The retention of DSI, with its knowledge of and experience with LB Steel and the industry in which it operates, will assist in the efficient administration of the estate, and minimize the expense to the estate.

48. Given the extent and complexity of LB Steel's business and liabilities, LB Steel

believes that it is essential that it retain DSI as its financial advisor to assist LB Steel to maximize the value of its assets by reorganization through a Chapter 11 plan or by a sale of its assets.

### III. SALE OF THE DEBTOR'S BUSINESS

49. Given LB Steel's operational limitations and debts, it believes that the value of its estate is best maximized and preserved by a going-concern sale. LB Steel intends to request Court approval to conduct an orderly marketing process and a going-concern sale of substantially all of its business and assets in one or more sale transactions pursuant to section 363 of the Bankruptcy Code.

50. The sale of LB Steel's assets presents the best opportunity to maximize the value for its estate. LB Steel intends to conduct an auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that LB Steel will receive the best possible consideration for its assets by helping ensure a competitive and fair bidding process.

51. LB Steel believes that a targeted sale process is most likely to achieve the highest and best price for its assets, enabling its assets to emerge successfully from this case.

[*Remainder of page intentionally left blank*]

-17-

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED: __10 — 19__, 2015

_____
Michael Goich, President of LB Steel, LLC