---

**ASSET PURCHASE AND SALE AGREEMENT**

**BY AND AMONG**

**LB STEEL, LLC**

**AND**

**LB METALS, LLC**

**Dated as of February 24, 2016**

---

## TABLE OF CONTENTS

**Page**

ARTICLE 1 PURCHASE AND SALE ............................................................................... 1

    1.1      Purchase and Sale of Assets ......................................................................... 1

    1.2      Excluded Assets ............................................................................................ 4

    1.3      Assumption of Liabilities ............................................................................. 5

    1.4      Excluded Liabilities ...................................................................................... 5

    1.5      Assumed Contracts. ....................................................................................... 7

    1.6      Further Conveyances and Assumptions. ....................................................... 7

    1.7      Bulk Sales Laws ............................................................................................ 8

    1.8      Receivables .................................................................................................... 8

    1.9      Option to Purchase Acquisitions V ............................................................... 8

    1.10    Prorations. ...................................................................................................... 9

    1.11    Purchased Assets Sold "As Is, Where Is". .................................................... 9

ARTICLE 2 PURCHASE PRICE ...................................................................................... 9

    2.1      Purchase Price ............................................................................................... 9

    2.2      Payment of the Purchase Price and Assumption of Assumed Liabilities ......... 10

    2.3      Allocation of Purchase Price ...................................................................... 10

    2.4      Preparation of Estimated Working Capital Adjustment Worksheet. ............... 11

    2.5      Preparation of Final Working Capital Adjustment Worksheet. ...................... 12

    2.6      Withholding Rights ..................................................................................... 13

    2.7      Sale Free and Clear ..................................................................................... 13

ARTICLE 3 CLOSING AND TERMINATION .............................................................. 14

    3.1      Closing Date ................................................................................................ 14

    3.2      Deliveries by Seller .................................................................................... 14

    3.3      Deliveries by Purchaser .............................................................................. 15

    3.4      Termination of Agreement .......................................................................... 15

    3.5      Effect of Termination .................................................................................. 16

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER ...................... 16

    4.1      Organization and Good Standing ................................................................ 16

    4.2      Title to Assets ............................................................................................. 17

    4.3      Authorization of Agreement ....................................................................... 17

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 4.4 | Real Property. | 17 |
| 4.5 | Tangible Personal Property; Capital Leases. | 18 |
| 4.6 | Intellectual Property. | 18 |
| 4.7 | Material Contracts. | 19 |
| 4.8 | Employee Benefits. | 20 |
| 4.9 | Labor. | 20 |
| 4.10 | Litigation | 20 |
| 4.11 | Financial Advisors | 20 |
| 4.12 | Accounts Receivable | 20 |
| 4.13 | Tax Matters. | 21 |
| 4.14 | No Undisclosed Liabilities | 21 |
| 4.15 | No Other Representations or Warranties; Schedules | 21 |
| ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF PURCHASER | | 22 |
| 5.1 | Organization and Good Standing | 22 |
| 5.2 | Authorization of Agreement | 22 |
| 5.3 | No Violation; Consents | 22 |
| 5.4 | Litigation | 23 |
| 5.5 | Financial Capability | 23 |
| 5.6 | Bankruptcy | 23 |
| 5.7 | Financial Advisors | 23 |
| 5.8 | Condition of the Business and Purchased Assets | 23 |
| 5.9 | OFAC | 23 |
| ARTICLE 6 BANKRUPTCY COURT MATTERS | | 24 |
| 6.1 | Alternative Transaction. | 24 |
| 6.2 | Bankruptcy Court Approval | 24 |
| 6.3 | Sale Order | 25 |
| ARTICLE 7 COVENANTS | | 25 |
| 7.1 | Access to Information | 25 |
| 7.2 | Conduct of the Business Pending the Closing. | 25 |
| 7.3 | Consents | 26 |

# TABLE OF CONTENTS

(continued)

**Page**

| | | |
|---|---|---|
| 7.4 | Appropriate Action; Filings | 26 |
| 7.5 | Confidentiality | 26 |
| 7.6 | Preservation of Records; Cooperation | 27 |
| 7.7 | Supplements and Amendments to Schedules | 27 |
| 7.8 | Further Assurances | 27 |
| 7.9 | Adequate Assurance | 27 |
| ARTICLE 8 | EMPLOYEE AND EMPLOYEE BENEFITS MATTERS; TAX MATTERS; OTHER AGREEMENTS | 28 |
| 8.1 | Employment. | 28 |
| 8.2 | Employee Matters. | 28 |
| 8.3 | Collective Bargaining Agreement | 29 |
| 8.4 | Tax Matters. | 29 |
| ARTICLE 9 | CONDITIONS TO CLOSING | 30 |
| 9.1 | Conditions Precedent to Obligations of Purchaser | 30 |
| 9.2 | Conditions Precedent to Obligations of Seller | 31 |
| 9.3 | Conditions Precedent to Obligations of Purchaser and Seller | 32 |
| 9.4 | Frustration of Closing Conditions | 32 |
| ARTICLE 10 | LIMITATIONS | 32 |
| 10.1 | Purchaser's Review. | 32 |
| 10.2 | No Consequential or Punitive Damages | 32 |
| ARTICLE 11 | MISCELLANEOUS | 33 |
| 11.1 | Survival of Representations, Warranties, Covenants and Agreements | 33 |
| 11.2 | Remedies | 33 |
| 11.3 | Expenses | 33 |
| 11.4 | Non-Recourse | 34 |
| 11.5 | Submission to Jurisdiction. | 34 |
| 11.6 | Waiver of Jury Trial | 34 |
| 11.7 | Time of Essence | 35 |
| 11.8 | Entire Agreement; Amendments and Waivers | 35 |
| 11.9 | Governing Law | 35 |

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 11.10 | Notices | 35 |
| 11.11 | Severability | 37 |
| 11.12 | No Right of Set-Off | 37 |
| 11.13 | Binding Effect; Assignment | 37 |
| 11.14 | Headings | 37 |
| 11.15 | Counterparts | 37 |
| 11.16 | Interpretation | 37 |

# TABLE OF CONTENTS

<u>Schedules</u>

Schedule 1.0            Definitions
Schedule 1.1(b)         Purchaser Assumed Contracts
Schedule 1.2(a)         [Omitted]
Schedule 1.2(m)         Excluded Assets
Schedule 4.1            Organization and Good Standing
Schedule 4.4(a)         Real Property Title and Leases
Schedule 4.5(a)         Personal Property Leases
Schedule 4.5(b)         Capital Leases
Schedule 4.6(a)         Intellectual Property Registrations
Schedule 4.6(b)         Intellectual Property Licenses
Schedule 4.6(c)         Intellectual Property Exceptions
Schedule 4.7(a)         Material Contracts
Schedule 4.8(a)         Employee Benefit Plans
Schedule 4.8(c)         Qualified Plans
Schedule 4.9(a)         Collective Bargaining Agreements
Schedule 4.9(b)         Work Stoppages
Schedule 4.10           Litigation
Schedule 4.11           Seller's Financial Advisors
Schedule 4.13           Tax Returns
Schedule 5.7            Purchaser's Financial Advisors
Schedule 7.2(a)         Required Conduct of Business Pending Closing
Schedule 8.l(a)         Transferred Employees
Schedule 9.l(e)         Required Consents

<u>Exhibits</u>

Exhibit 2.4             Estimated Working Capital Adjustment Worksheet

## ASSET PURCHASE AND SALE AGREEMENT

THIS ASSET PURCHASE AND SALE AGREEMENT (this "*Agreement'*), dated as of February 24, 2015 (the "*Execution Date*"), is made and entered into by and among LB Steel, LLC, a Delaware limited liability company ("*Seller*"), and LB Metals, LLC, an Illinois limited liability company ("*Purchaser*").    Seller and Purchaser are sometimes herein referred to collectively as the "*Parties*" and each individually as a "*Party*."  Capitalized terms shall have the meaning set forth on <u>Schedule 1.0</u> unless otherwise defined herein.

### WITNESSETH:

WHEREAS, on October 18, 2015 (the "*Petition Date*"), Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "*Bankruptcy Code*"), commencing the Bankruptcy Case which is pending in the United States Bankruptcy Court for the Northern District of Illinois (the "*Bankruptcy Court*");

WHEREAS, Seller is a distributor and provider of fabrication, machining, processing, burning and assembly of prime, non-prime, and strip mill steel plate and steel parts for the construction, agricultural, mining equipment and power generation industries to its customers and is one of the largest turnkey manufacturers of steel counterweights in North America.  (such businesses and all other businesses conducted by Seller, including the Warren Business, the "*Business*");

WHEREAS, on the terms and subject to the conditions hereinafter set forth and pursuant to a Sale Order, the Parties desire to enter into this Agreement pursuant to which, among other things, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, all of Seller's right, title and interest in and to the Purchased Assets and Purchaser shall assume from Seller and thereafter pay, discharge and perform the Assumed Liabilities;

WHEREAS, in light of the current circumstances, a sale of Seller's assets is necessary to maximize value and is in the best interest of Seller and its creditors; and

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and would be consummated only pursuant to a Sale Order to be entered by the Bankruptcy Court and applicable provisions of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, representations, warranties and agreements herein contained, and intending to be legally bound hereby, the Parties hereby agree as follows:

### ARTICLE 1
### PURCHASE AND SALE

1.1    <u>Purchase and Sale of Assets</u>.  Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Seller shall sell, transfer, assign, convey and deliver to Purchaser (or its designee), and Purchaser (or its designee) shall purchase, acquire and accept from Seller, free and clear of any and all Liens (other than Liens created by Purchaser and Permitted Liens), to the fullest extent permitted by law, including, without limitation, all of Seller's right, title and

interest in, to and under any and all of the assets, properties, rights and claims of any kind or nature, whether tangible or intangible, real, personal or mixed, wherever located and whether or not carried or reflected on the books and records of Seller, which are used or useful in or held for use in connection with the operation of the Business, excluding only the Excluded Assets expressly identified in <u>Section 1.2</u> (such assets, properties, rights and claims to be acquired hereunder, collectively, the "***Purchased Assets***").  Without limiting the foregoing, the Purchased Assets shall include the following:

(a)     all Accounts Receivable;

(b)     all Purchaser Assumed Contracts set forth on <u>Schedule 1.1(b)</u>;

(c)     all rights, claims, benefits and remedies with respect to security deposits held by third parties, advances and other payments· made by· Seller prior to the Closing for goods and services to be received after the Closing, and all other rebates, refunds, returns, rights of setoff, rights of recoupment and credits of Seller with respect to any third party ("***Deposits***");

(d)     all tangible personal property owned by Seller related to, used in, or held for use in the conduct of the Business, including merchandise, supplies, samples, machinery, equipment, Inventory and any other inventory, work in process, televisions, monitors, video players, computers, hardware, electronics, file servers, scanners, printers, networks, copiers, furniture, furnishings, fixtures, telephone lines, telecopy machines, telecommunication equipment, storeroom contents, spare parts, shipping materials, packaging materials, raw materials and other consumables relating to or available for sale or use in connection with the Business, and all rights, title and interest of Seller in and to any personal property subject to a lease or financial lease that is related to, used in, or held for use in the conduct of the Business (collectively, the "***Tangible Personal Property***" );

(e)     all right, title and interests in real property, including, without limitation fee title and leasehold interests and leasehold improvements, fixtures and other appurtenances held by Seller, including all security deposits, reserves, prepaid rent and other rights and privileges related thereto, including without limitation all rights, claims, benefits and remedies with respect to those certain real properties commonly known as 15700 Lathrop Ave., Harvey, IL 60426, 296 East 156th Street, Harvey, IL 60426 and 5600 South Topeka Blvd., Topeka, KS 66609 and Seller shall allow all Warren Property located at the Warren Facility and purchased by Purchaser pursuant to the terms of this Agreement to remain at the Warren Facility without cost to Purchaser for a period lasting from the Closing Date until the one hundred twenty (120) day anniversary of the Closing Date (the "***Warren Property Deadline***") and shall grant Purchaser the right to enter the Warren Facility and remove such Warren Property until the Warren Property Deadline;

(f)     the Intellectual Property, together with any and all (i) corresponding rights that may be secured in connection therewith anywhere in the world, (ii) copies and electronic, tangible and other embodiments thereof, (iii) rights to collect income and royalties and to recover damages or lost profits in connection therewith, and (iv) rights to sue and recover and other rights and remedies related thereto for past, present or future infringement, dilution, misappropriation or other violation thereof;

- 2 -

(g)  to the extent transferable and/or assignable, after giving effect to the Sale Order, all of the rights and benefits accruing from and after the Closing under any of the Purchaser Assumed Contracts, including, without limitation, each Real Property Lease, personal property lease or Intellectual Property License that is a Purchaser Assumed Contract;

(h)  all books and records, including blueprints, drawings and other technical papers, equipment manuals and maintenance records, inventory records and data, asset history records and data, production records and data, service records and data, quality control records and data, customer records and data, supplier records and data, sales records and data, accounting records and data (including ledgers and books of original entry), insurance records and files, Transferred Employee records and files, payroll records and files, regulatory compliance records and files, environmental compliance records and files, any applicable employee safety and health laws and regulations compliance records and files, any documents relating to marketing, advertising or promotional materials, and any and all other correspondence, literature, records, data and files used in, related to, required for the conduct of or otherwise beneficial to the Business or any of the Purchased Assets, to the extent transferrable by Law ("***Books and Records***");

(i)  to the extent assignable, all rights, incidents of interest and benefits accruing under any Licenses held, used or made by Seller in the Business, including all pending applications therefore;

(j)  all warranties and guarantees related to the Purchased Assets, to the extent assignable, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets, and claims against suppliers and other third parties in connection with the Purchaser Assumed Contracts;

(k)  assignable proceeds received after the Closing Date under insurance policies of Seller to the extent received or receivable with respect to the Business or the Purchased Assets other than proceeds related to the following (which, for the avoidance of doubt, are Excluded Assets): any policies relating to the liability of Seller's directors and officers, insurance claims under the commercial general liability insurance policies with and rights to pursue litigation against St. Paul Guardian Insurance Company related to the case captioned *Walsh Construction Company v. LB Steel, LLC, et al.*, as amended (the "***Third Party Complaint***") filed in the matter captioned *The City of Chicago v. Murphy/Jahn, Inc. Architects, et al.*, No. 07 L 003886, Circuit Court of Cook County, Illinois and the judgement entered in favor of Seller against Calumet Testing Services, Inc. and the City of Chicago in Case Nos. 05CH2675, 08L6675 and 07L3886;

(l)  all assignable third party property and casualty insurance policy proceeds, all rights to prepaid insurance premiums or insurance refunds or rebates, and all rights to third party property and casualty insurance proceeds in respect of the Business relating to losses;

(m)  all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(n)  all non-disclosure or other confidentiality agreements entered between Seller and any potential purchaser of the Purchased Assets;

(o)     all goodwill and other intangible assets associated with the Business, including customer and supplier lists;

(p)     all other assets, properties, rights and claims of Seller of any kind or nature which relate to the Business, which are used or useful in or held for use in the Business, or which relate to the Purchased Assets (in each case, other than the Excluded Assets) not otherwise described in this Section 1.1.  For avoidance of doubt, the Purchased Assets include all right, title and interest of Seller in all Accounts Receivable, Intellectual Property, vehicles, goodwill, Purchaser Assumed Contracts, Deposits, Books and Records, Licenses, and Tangible Personal Property located at the Warren Facility or used in the Warren Business (the "***Warren Property***"); and

(q)     the Goich Insider Avoidance Claims.

1.2     Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller shall retain all right, title and interest to, in and under the Excluded Assets.  "***Excluded Assets***" shall mean only the following assets:

(a)     all Cash;

(b)     all Contracts and associated Contract Rights of Seller other than the Purchaser Assumed Contracts (the "***Excluded Contracts***");

(c)     all equity interests in Seller;

(d)     all of Seller's ownership interest in, and all assets, rights, property, claims, causes of action, interests and Liabilities held by Acquisition V including, without limitation, the ownership interests held by Acquisition V in and to the Warren Facility.

(e)     any (i) confidential personnel and medical records pertaining to any Employee of Seller not permitted to be transferred to Purchaser under applicable Law; (ii) books and records that Seller is required by Law to retain or that relate exclusively to the Excluded Assets or the Excluded Liabilities, including Tax Returns, financial statements, and corporate or other entity filings; and (iii) corporate charters, qualifications to do business, taxpayer and other identification numbers, corporate seals, minute books, stock ledgers, stock certificates and any other documentation related to governance, organization, maintenance or existence of Seller;

(f)     any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date;

(g)     all rights and claims of Seller under the Transaction Documents, including the Purchase Price;

(h)     all Employee Benefit Plans, except to the limited extent necessary to meet the Employee Obligations and Liabilities from or relating to such Employee Benefit Plans solely with respect to Transferred Employees, and such other Liabilities of Seller to the extent specifically provided in Article 8;

(i)       all deposits with respect to any professional retainers (including all legal, accounting, financial advisory, valuation, investment banking and other third party advisory or consulting fees and expenses) incurred by or on behalf of Seller or its Affiliates in connection with the Bankruptcy Case or the Transactions;

(j)       all Litigation Claims, excluding the Goich Insider Avoidance Claims;

(k)       all deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Asset;

(l)       all rights, claims and causes of action of Seller solely relating to Excluded Assets; and

(m)       the assets, properties and rights of Seller set forth on Schedule 1.2(m);

1.3    Assumption of Liabilities.   On the terms contained in this Agreement, Purchaser hereby assumes and agrees to pay, discharge and perform in full when due the following (and only the following) Liabilities of Seller (the "*Assumed Liabilities*"):

(a)       all Liabilities of Seller under the Purchaser Assumed Contracts;

(b)       all Employee Obligations;

(c)       all Employee Obligations and Liabilities from or relating to Employee Benefit Plans solely with respect to Transferred Employees, and such other Liabilities of Seller to the extent specifically provided in Article 8;

(d)       an amount equal to all Transfer Taxes, if any; and

(e)       all Liabilities with respect to Cure Costs in excess of the Cure Cost Threshold.

1.4    Excluded Liabilities.   Purchaser shall not assume and shall not be responsible to pay, perform, address or discharge any Liabilities of Seller, other than the Assumed Liabilities (the "*Excluded Liabilities*").   Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement is intended to require Purchaser to pay, perform, address or otherwise discharge any Liability included in the Excluded Liabilities.   Without limiting the foregoing, the following Liabilities are Excluded Liabilities under this agreement:

(a)       all Liabilities arising after the Closing Date for damages arising under customer warranties, expressed or implied, issued by Seller prior to the Closing Date;

(b)       all Liabilities for accrued expenses and accounts payable incurred prior to the Closing Date, except to the extent that the same constitute Assumed Liabilities pursuant to Section 1.3;

(c)       all Liabilities arising out of any of the Excluded Assets, including Excluded Contracts;

(d)      all Liabilities and obligations arising under or relating to Environmental Laws, and all other Liabilities relating to any Laws in connection with any environmental, health or safety, or natural resource matters arising or existing during Seller's operation of the Business prior to the Closing Date or arising from the Seller's operation of the Business after the Closing;

(e)      all Liabilities arising from or relating to Employee Benefit Plans, provided that this Section 1.4(e) shall not include Liabilities with respect to Transferred Employees arising from or relating to Employee Benefit Plans;

(f)      all Liabilities arising from or relating to any collective bargaining agreements, union contracts, and other similar agreements;

(g)      all Liabilities arising from or related to accrued and unpaid wages, salary and commissions of Company employees;

(h)      all Liabilities relating to any claims for infringement, dilution, misappropriation or any other violation of the Intellectual Property of a third Person arising from Seller's operation of the Business prior to the Closing Date;

(i)      all Liabilities for any Taxes of Seller including, but not limited to, Liabilities of Seller for any Taxes arising in connection with the consummation of the transactions contemplated hereby, other than those assumed pursuant to Sections 1.3(b), 1.3(c) and 1.3(d);

(j)      all Liabilities of Seller for Taxes of any Person under Reg. § 1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by contract or otherwise.

(k)      all Liabilities for Taxes with respect to the Purchased Assets allocated under Section 8.2 hereof to any Pre-Closing Tax Period;

(l)      all Liabilities of Seller relating to claims under the WARN Act or other similar statutes, reclamation claims, and claims under Section 503(b)(9) of the Bankruptcy Code;

(m)      all Liabilities arising as a result of any Legal Proceeding initiated at any time, to the extent related to the Business or the Purchased Assets on or prior to the Closing Date, including any shareholder Legal Proceedings, actions for breach of contract, or any tort actions; and

(n)      all Liabilities for any legal, accounting, investment banking, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by Seller in connection with, resulting from or attributable to, the transactions contemplated hereby, the Bankruptcy Case or otherwise.

(o)      all Liabilities with respect to Cure Costs equal to or less than the Cure Cost Threshold.

(p)      all Liabilities incurred in the ordinary course of business existing prior to the Petition Date other than Assumed Liabilities.

- 6 -

1.5    Assumed Contracts.

(a)    On or before seven (7) days prior to the Closing, Purchaser shall have provided to Seller a preliminary list of all Purchaser Assumed Contracts related to the Business or Purchased Assets, identifying the name, parties and date of each such Purchaser Assumed Contracts (the "*Assigned Contracts List*").

(b)    Notwithstanding the foregoing, Purchaser shall be entitled to amend the Assigned Contracts List no later than one (1) Business Day before the Closing, and any Purchaser Assumed Contracts added to the Assigned Contracts List before the Sale Hearing shall be Purchased Assets and any Purchaser Assumed Contracts removed from the Assigned Contracts List before the Sale Hearing shall be Excluded Assets.

(c)    Purchaser shall assume and agree to perform and discharge the Assumed Liabilities under the Purchaser Assumed Contracts pursuant to this Agreement and the Assignment and Assumption Agreement.  From and after the date hereof, Seller shall not reject any Assignable Contract unless otherwise agreed to in writing by Purchaser.

(d)    Seller shall be responsible for the verification of all Cure Costs for each Purchaser Assumed Contract, and shall use commercially reasonable efforts to establish the proper Cure Costs, if any, for each Purchaser Assumed Contract prior to the Closing, *provided, however*, that the Cure Costs with respect to the Harvey Leases shall be ninety eight thousand two hundred ten and 94/100 dollars ($98,210.94).

(e)    Seller shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to Purchaser Assumed Contracts and Seller shall use its commercially reasonable efforts to take all other actions necessary to cause the Purchaser Assumed Contracts to be assigned to Purchaser as of the Closing.  At or prior to the Closing, Seller shall comply with all requirements under Section 365 of the Bankruptcy Code and all other applicable Laws necessary to assign the Purchaser Assumed Contracts to Purchaser.

(f)    Notwithstanding anything in this Agreement to the contrary, on the date any Assignable Contract is assumed and assigned to Purchaser pursuant to this Section 1.5, such Contract shall be deemed a Purchaser Assumed Contract for all purposes under this Agreement.

1.6    Further Conveyances and Assumptions.

(a)    From time to time following the Closing and except as prohibited by Law, Seller shall, at Purchaser's expense, make available to Purchaser such non-confidential data in personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)    From time to time following the Closing, Seller and Purchaser shall, at no cost to Seller, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Transaction Documents and

- 7 -

to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the Assumed Liabilities assumed by Purchaser under this Agreement and the Transaction Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

(c)      Nothing in this Agreement nor the consummation of the Transactions shall be construed as an attempt or agreement to transfer or assign any Purchased Asset, including any Contract, License, certificate, approval, authorization or other right, which is not capable of being assigned pursuant to section 365 of the Bankruptcy Code or transferred pursuant to section 363 of the Bankruptcy Code to Purchaser at the Closing ("***Nonassignable Assets***") unless and until such assignment or transfer shall be permitted.   Seller and Purchaser each shall use commercially reasonable efforts to cooperate with the other in endeavoring to obtain any required consent or relieve any applicable restriction; provided that no Party shall be obligated to incur any costs or expenses or provide any financial accommodation or other consideration of any nature to any Person to facilitate the assignment or transfer of any Nonassignable Asset. Notwithstanding the foregoing, Seller shall not have any obligation to renew any Nonassignable Asset upon the expiration or termination thereof.

(d)      Each Nonassignable Asset shall be held, as of and from the Closing Date, for the benefit of Purchaser provided that all covenants and obligations thereunder shall be fully performed by Purchaser on Seller's behalf (to the extent such covenants and obligations are Assumed Liabilities) and all rights (to the extent such rights are Purchased Assets) existing thereunder shall be for Purchaser's account.   To the extent permitted by applicable Law, Seller shall take or cause to be taken, at Purchaser's expense, such actions as Purchaser may reasonably request which are required to be taken or appropriate in order to provide Purchaser with the benefits of the Nonassignable Asset.   Seller shall promptly pay over to Purchaser the net amount (after Taxes of Seller) of all payments received by it in respect of all Nonassignable Assets, other than payments received from Purchaser pursuant to this Agreement.

1.7      <u>Bulk Sales Laws</u>.   Purchaser hereby waives compliance by Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

1.8      <u>Receivables</u>.   If, following the Closing, Seller shall receive payment in respect of accounts receivable that are included in the Purchased Assets, then Seller shall hold such amounts in trust for Purchaser and shall promptly forward such payment to Purchaser.

1.9      <u>Agreement for Option to Warren Real Estate</u>. Purchaser and Seller shall have, and Seller shall cause LB Steel Acquisitions V, LLC, a Delaware limited liability company and wholly owned subsidiary of Seller ("***Acquisitions V***") to have entered into an agreement in form and substance acceptable to Purchaser and Seller pursuant to which Purchaser (or its designee) is granted an option, exercisable during the period ending 60 days after Closing, to purchase for a payment of $150,000 all of Seller's limited liability company interests in Acquisitions and/or all of Acquisitions' right, title or interest in and to the Warren Facility. Purchaser acknowledges that any transfer to Purchaser of the Warren Facility from Acquisitions will be subject to existing interests, other than the interest of Acquisitions.

1.10    Prorations. At Closing, Seller and Purchaser shall prorate rents, utilities, state and local real and personal property taxes for the Purchased Assets that relate to both pre-closing and post-closing periods with respect to the Purchased Assets and Assumed Liabilities.  If a prorated amount is payable by Purchaser, it shall be considered an increase of the Cash Purchase Price and shall be paid as promptly as possible to Seller. If a prorated amount is payable by Seller, it shall be considered a deduction of the Cash Purchase Price and shall be paid as promptly as possible to Purchaser. Prorated amounts payable by either party that are not determinable at the Closing shall be paid as promptly as possible to the other party once such amounts are determined.

1.11    Purchased Assets Sold "As Is, Where Is".  EXCEPT AS OTHERWISE SET FORTH HEREIN, PURCHASER ACKNOWLEDGES AND AGREES THAT THE PURCHASED ASSETS SOLD PURSUANT TO THIS AGREEMENT ARE SOLD, CONVEYED, TRANSFERRED AND ASSIGNED ON AN "AS IS, WHERE IS" BASIS "WITH ALL FAULTS" AND THAT, NOTWITHSTANDING ANYTHING SET FORTH HEREIN TO THE CONTRARY, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, TERMS, CONDITIONS, UNDERSTANDINGS OR COLLATERAL AGREEMENTS OF ANY NATURE OR KIND, EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE CONCERNING THE PURCHASED ASSETS OR THE CONDITION, DESCRIPTION, QUALITY, USEFULNESS, QUANTITY OR ANY OTHER THING AFFECTING OR RELATING TO THE PURCHASED ASSETS INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH WARRANTIES ARE ALSO HEREBY EXPRESSLY DISCLAIMED.

EXCEPT AS EXPRESSLY PROVIDED IN ARTICLE 4, SELLER FURTHER MAKES NO REPRESENTATION OR WARRANTY AS TO ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR OTHER INFORMATION DELIVERED OR MADE AVAILABLE BY SELLER TO PURCHASER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, THE DUE DILIGENCE MATERIALS).  THE PROVISIONS OF THIS SECTION 1.11 SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT AND SHALL BE INCORPORATED INTO THE CLOSING DOCUMENTS TO BE DELIVERED AT CLOSING.

### ARTICLE 2
### PURCHASE PRICE

2.1    Purchase Price.  In consideration of the sale of the Purchased Assets to Purchaser, and upon the terms and subject to the conditions hereinafter set forth and subject to the proration set forth in Section 1.10, the purchase price for the Purchased Assets shall be the aggregate of (collectively, the "*Purchase Price*"):

(i)    Eleven Million Seven Hundred Thousand Dollars ($11,700,000) (the "*Cash Purchase Price*"), as adjusted on Closing pursuant to Section 2.4(d) and as further adjusted on the Adjustment Date pursuant to Section 2.5(e); and

(ii)    the amount of the Assumed Liabilities.

- 9 -

2.2      <u>Payment of the Purchase Price and Assumption of Assumed Liabilities</u>.  The Purchase Price shall be paid and satisfied as follows:

(a)      No later than the Execution Date, Purchaser shall pay to the Deposit Escrow Agent, as defined below, by a certified or bank check or wire transfer an amount equal to the greater of $1,000,000 and five percent (5%) of the proposed Purchase Price as set forth in Purchaser's bid as a minimum good faith deposit (the "***Minimum Deposit Amount***") to be held in an escrow account (the "***Deposit Escrow Account***") established with First American Financial Corporation (the "***Deposit Escrow Agent***") and applied towards the Cash Purchase Price at the Closing in accordance with the terms of an escrow agreement in form and substance reasonably satisfactory to Seller and Purchaser (the "***Deposit Escrow Agreement***").

(b)      On Closing, Purchaser shall deposit an amount equal to $1,000,000 (the "***Adjustment Escrow Amount***") into an escrow account (the "***Adjustment Escrow Account***") established with First American Financial Corporation (the "***Adjustment Escrow Agent***") pursuant to the terms of an escrow agreement in form and substance reasonably satisfactory to Seller and Purchaser (the "***Adjustment Escrow Agreement***"), which Adjustment Escrow Amount shall be used solely for the satisfaction of any payment owed by Seller pursuant to <u>Section 2.5(e)</u> hereof;

(c)      On Closing, Purchaser shall pay by wire transfer to Seller an amount equal to the Cash Purchase Price, as adjusted pursuant to <u>Section 2.4(d)</u>, less the Minimum Deposit Amount and the Adjustment Escrow Amount.

(d)      On Closing, Purchaser shall satisfy the Assumed Liabilities by its execution and delivery of the Assignment and Assumption Agreement;

(e)      On Closing, Purchaser shall deliver to each of the counterparties to the Purchaser Assumed Contracts the full amount of the applicable Cure Costs for the assumption and assignment of such Contracts by Seller.

2.3      <u>Allocation of Purchase Price</u>.  Within sixty (60) days after the Closing Date, Purchaser shall prepare and deliver to Seller an allocation of the Purchase Price and any other items that are treated as additional purchase price for Tax purposes (the "***Taxable Consideration***") and the amount allocated to Seller among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury regulation (the "***Proposed Allocation***").  Seller shall have sixty (60) days after receipt of the Proposed Allocation to notify Purchaser in writing of any items of the Proposed Allocation that are not reasonable in Seller's good faith determination ("***Objection to Allocation***").  If Seller does not object in writing during such sixty (60) day period, then the Proposed Allocation shall be final and binding on all Parties.  If Seller objects in writing during such sixty (60) day period, then the Parties shall cooperate in good faith to reach a mutually agreeable allocation of the Taxable Consideration, which allocation shall be binding on all Parties.  If the Parties are unable to reach an agreement within sixty (60) days of Purchaser's receipt of Seller's Objection to Allocation, then any disputed items shall be referred to an independent accountant to be mutually agreed upon by Seller and Purchaser (the "***Accounting Referee***") for resolution, and the determination of the Accounting Referee shall be final and binding on the Parties.  The fees and expenses of the Accounting Referee shall be paid fifty

percent (50%) by Purchaser and fifty percent (50%) by Seller. In accordance with such binding allocation, Purchaser shall prepare and deliver to Seller copies of Form 8594 and any required exhibits thereto (the "**Asset Acquisition Statement**"). Purchaser shall prepare and deliver to Seller (or its designated successors) from time to time revised copies of the Asset Acquisition Statement (the "**Revised Statements**") so as to report any matters on the Asset Acquisition Statement that need updating, consistent with the agreed upon allocation. The Parties shall, and shall cause their respective controlled Affiliates to, use the allocations set forth in the Asset Acquisition Statement or, if applicable, the last Revised Statement (and file their applicable Tax Returns in accordance with applicable Law), for all Tax purposes and to file all Tax Returns (including, but not limited to, Internal Revenue Service Form 8594) in a manner consistent with such allocation statement and take no position contrary thereto, in each case, unless required to do so by applicable Tax Laws or good faith resolution of a Tax contest. Seller shall timely prepare, execute and deliver all such documents, forms and other information as are required to prepare such allocation.

2.4     Preparation of Estimated Working Capital Adjustment Worksheet.

(a)     Seller has set forth in Exhibit 2.4 the projected aggregate amount of the Current Asset Components as of March 9, 2016 set forth in the "Base Balance 3/9/2016" column of Exhibit 2.4 (the "**Base Current Assets Amount**").

(b)     No sooner than five (5) Business Days and no later than two (2) Business Days prior to the Closing Date, Seller shall deliver to Purchaser, in the form of Exhibit 2.4, the Estimated Working Capital Adjustment Worksheet. The Estimated Working Capital Adjustment Worksheet shall contain the Base Current Assets Amount as set forth in Exhibit 2.4 and as described in Section 2.4(a) above. The Estimated Working Capital Adjustment Worksheet shall also contain an estimate of the following amount set forth in the "Estimated Closing Balance 3/9/2016" column of the Estimated Working Capital Adjustment Worksheet: an estimate of the amounts of the Accounts Receivable and Inventory (broken out into two categories), Inventory - Plate and Inventory - Non-Plate based on Seller's estimate of the actual balance of such amounts on March 9, 2016 (the aggregate of such estimated amounts being defined as the "**Closing Date Estimated Current Assets Amount**"). The Estimated Working Capital Adjustment Worksheet shall be accompanied by a written statement executed by the President and/or the Chief Restructuring Officer of Seller in form and substance reasonably acceptable to Seller and Purchaser (the "**Estimated Working Capital Adjustment Worksheet Certificate**") certifying that the Estimated Working Capital Adjustment Worksheet has been prepared in good faith by Seller based upon available information as of the date of delivery of the Estimated Working Capital Adjustment Worksheet.

(c)     Seller shall calculate the variance between the Estimated and Base amounts for each of the working capital elements set forth on the Estimated Working Capital Adjustment Worksheet and shall calculate the variance for each such element based on the applicable adjustment factor set forth on Exhibit 2.4. Seller shall calculate the resulting differences between the Base Current Assets Amount and the Closing Date Estimated Current Assets Amount. Notwithstanding the foregoing or anything herein to the contrary, in the event that, after delivering the Estimated Working Capital Adjustment Worksheet but before consummation of the Closing, Seller becomes aware of any information that would render the Estimated Working

Capital Adjustment Worksheet inaccurate, then Seller shall update the Estimated Working Capital Adjustment Worksheet to reflect such information and such updated Estimated Working Capital Adjustment Worksheet shall be used in determining the amount of the Cash Purchase Price to be paid by Purchaser on Closing.

(d)     The Cash Purchase Price shall be increased by the amount, if any, by which the Closing Date Estimated Current Assets Amount exceeds the Base Current Assets Amount or decreased by the amount, if any, by which the Base Current Assets Amount exceeds the Closing Date Estimated Current Assets Amount.

2.5     Preparation of Final Working Capital Adjustment Worksheet.

(a)     Promptly after Closing, Purchaser shall prepare in consultation with the advisors of Purchaser that are designated by Purchaser, at Purchaser's expense, a draft of the Final Working Capital Adjustment Worksheet, which shall be delivered to Seller as soon as possible following Closing with Purchaser using commercially reasonable efforts and in no event later than sixty (60) days following the Closing Date.  The Final Working Capital Adjustment Worksheet shall contain the values set forth in the Estimated Working Capital Adjustment Worksheet and shall also contain an estimate the following amounts set forth in the "Final Closing Balance 3/9/2016" column of the Final Working Capital Adjustment Worksheet: the Final Current Assets Amount and the calculation of the Final Current Assets Adjustment Amount.

(b)     During the period from the date of delivery of the draft Final Working Capital Adjustment Worksheet until the date no later than twenty (20) days after delivery of the Final Working Capital Adjustment Worksheet, Purchaser shall give Seller and its representatives such assistance and access to the books, records and Purchaser's representatives as Seller and its representatives may reasonably request in order to enable them to assess the draft Final Working Capital Adjustment Worksheet.  Purchaser and its representatives shall give Seller and its representatives reasonable notice prior to inventory counts and other procedures used in the preparation of draft Final Working Capital Adjustment Worksheet, and Seller and its representatives shall be entitled to be present at such proceedings and shall be provided promptly with copies of all working papers created by Purchaser and its representatives in connection with such preparation.

(c)     If Seller does not give a notice of objection in accordance with Section 2.5(d), Seller shall be deemed to have accepted the draft Final Working Capital Adjustment Worksheet prepared by Purchaser, which shall be final and binding on Seller and Purchaser, and such draft Final Working Capital Adjustment Worksheet shall constitute the Final Working Capital Adjustment Worksheet for the purposes of this Agreement immediately following the expiration date for the giving of such notice of objection.

(d)     If Seller objects to any matter in the draft Final Working Capital Adjustment Worksheet prepared pursuant to this Section 2.5, then Seller shall give notice to Purchaser no later than twenty (20) days after delivery of the draft Final Working Capital Adjustment Worksheet, setting out in reasonable detail the particulars of such objection.  If Seller delivers such objection within such twenty (20) day period, then Seller and Purchaser shall use

- 12 -

reasonable efforts to resolve such objection for a period of thirty (30) days following the giving of such notice.  If the matter is not resolved by the end of such thirty (30) day period, then the dispute with respect to such objection shall be submitted by Seller and Purchaser jointly to the Accounting Referee.  The Accounting Referee retained shall, as promptly as practicable, make a determination of the Final Working Capital Adjustment Worksheet, which, subject to any disputes, shall be final and binding upon Seller and Purchaser and shall constitute Final Working Capital Adjustment Worksheet for the purposes of this Agreement.  Any dispute with respect to the joint appointment of the Accounting Referee or with respect to any determination made by the Accounting Referee shall be referred to the Bankruptcy Court.  The determination made by the Bankruptcy Court shall be final and binding upon Seller and Purchaser and, if applicable, shall constitute the Final Working Capital Adjustment Worksheet for purposes of this Agreement, and neither Seller nor Purchaser shall have any right of appeal.  All fees and expenses related to the Accounting Referee or any dispute of the Accounting Referee's determination shall be borne 50%/50% by Seller and Purchaser.

(e)     On the Adjustment Date, the Cash Purchase Price shall be increased by the amount by which the Final Current Assets Amount exceeds the Closing Date Estimated Current Assets Amount, or decreased by the amount by which the Final Current Assets Amount is less than the Closing Date Estimated Current Assets Amount, the aggregate net amount of such increases and decreases to the Cash Purchase Price pursuant to this sentence being referred to as the "***Final Adjustment Amount***" ).  On the Adjustment Date, if the Final Adjustment Amount is a positive number, Purchaser shall pay to Seller an amount equal to the positive Final Adjustment Amount or, alternatively, if the Final Adjustment Amount is a negative number, Seller shall pay to Purchaser an amount equal to the absolute value of the negative Final Adjustment Amount.  Any amounts required to be paid by Seller to Purchaser pursuant to this Section 2.5(e) shall be paid out of the Adjustment Escrow Account in accordance with the terms of the Adjustment Escrow Agreement.  After any such payments have been made to Purchaser, the remainder of the Adjustment Escrow Amount, if any, shall be distributed to Seller, as more particularly set out in the Adjustment Escrow Agreement.  Any amounts owing by Seller to Purchaser in excess of the Adjustment Escrow Amount shall be waived by Purchaser.  Purchaser's sole recourse pursuant to this Section 2.5(e) shall be payment out of the Adjustment Escrow Account.  For the avoidance of doubt, all amounts payable on the Adjustment Date under this Section 2.5(e) shall be treated as adjustments to the Cash Purchase Price.

2.6     Withholding Rights.  Notwithstanding anything in this Assignment to the contrary, Purchaser or its respective designee shall be entitled to withhold and deduct from any amounts payable pursuant to this Agreement such amounts as Purchaser or its respective designee are required to deduct and withhold with respect to the making of such payment under the Code or any provision of state, local or foreign Tax law.  To the extent that amounts are so withheld and paid over to the appropriate Tax authority, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding were made.

2.7     Sale Free and Clear.  Seller acknowledges and agrees and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising interests as defined in 11 U.S.C. § 363(f) including but not limited to Seller Liabilities, Legal Proceedings and Liens including, without limitation, the Excluded Liabilities (and other than

- 13 -

those in favor of Purchaser created under this Agreement and/or any Transaction Documents, the Permitted Liens, if any, and Assumed Liabilities) of, against or created by any of Seller or the Estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Purchased Assets and thereupon shall attach to the Purchase Price, with the same force, effect, validity, enforceability, and priority as such Seller Liabilities, Legal Proceedings and Liens had attached to the Purchased Assets.  On the Closing Date in accordance with <u>Section 3.1</u> of this Agreement, the Purchased Assets shall be transferred, conveyed and assigned to Purchaser or its designee to the fullest extent permitted by Section 363 of the Bankruptcy Code, free and clear of all Seller Liabilities, Legal Proceedings and Liens other than the Permitted Liens, if any, interests, and the Assumed Liabilities.

## ARTICLE 3
## CLOSING AND TERMINATION

3.1    <u>Closing Date</u>.  The consummation and effectuation of the transactions contemplated hereby pursuant to the terms and conditions of this Agreement (the "***Closing***") shall take place at the offices of Perkins Coie LLP located at 131 South Dearborn Street, Suite 1700, Chicago, Illinois at 10:00 a.m. local time on the date that is no later than the fifteenth (15th) day following the entry of the Sale Order; provided, that, to the extent the conditions set forth in <u>Article IX</u> are not satisfied (except for closing conditions that by their terms can only be satisfied at the Closing) or so waived on or prior to such date, the period of time within which the Closing shall occur shall be automatically extended until, and the Closing shall occur promptly (but no later than two (2) Business Days) following, such date as all of the conditions set forth in <u>Article IX</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived by the party entitled to waive the applicable condition, unless another time or date, or both, are agreed to in writing by the Parties.  The date on which the Closing shall be held is referred to in this Agreement as the "***Closing Date***."  All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

3.2    <u>Deliveries by Seller</u>.  At the Closing, Seller shall deliver to Purchaser:

(a)    a duly executed bill of sale in a form agreed upon by Seller and Purchaser;

(b)    a duly executed assignment and assumption agreement in a form agreed upon by Seller and Purchaser (the "***Assignment and Assumption Agreement***");

(c)    duly executed assignments transferring all of Seller's rights, titles and interests in and to the Intellectual Property, in a form suitable for recording in the U.S. Patent and Trademark Office and U.S. Copyright Office;

(d)    a duly executed Adjustment Escrow Agreement;

(e)    duly executed assignment and assumption agreements with respect to each Real Property Lease;

(f)    copies of all consents, waivers and approvals referred to in <u>Section 9.1(d)</u>;

(g)    a certificate of non-foreign status pursuant to Section 1445 of the Code and Treasury Regulation Section 1.1445-2(b) and a fully and properly executed IRS Form W-9;

(h)    a copy of the entered Sale Order;

(i)    a certificate signed by an authorized officer of Seller (in form and substance reasonably satisfactory to Purchaser) pursuant to Sections 9.1(a) and (b)); and

(j)    such customary instruments of transfer, assumptions, filings or documents, in form and substance reasonably satisfactory to Purchaser, as may be required to give effect to this Agreement.

3.3    Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to Seller:

(a)    the cash portion of the Purchase Price;

(b)    a duly executed Assignment and Assumption Agreement;

(c)    duly executed assignment and assumption agreements with respect to each Real Property Lease;

(d)    a duly executed Adjustment Escrow Agreement;

(e)    a certificate signed by an authorized officer of Purchaser (in form and substance reasonably satisfactory to Seller) pursuant to Sections 9.2(a) and (b); and

(f)    such other customary instruments of transfer, assumptions, filings or documents, in form and substance reasonably satisfactory to Seller, as may be required to give effect to this Agreement.

3.4    Termination of Agreement.  This Agreement may be terminated prior to the Closing Date as follows:

(a)    At any time prior to the Closing Date by the joint written consent of Seller and Purchaser;

(b)    By Seller or Purchaser if the Closing has not occurred on or before March 9, 2016[1] (the "**Outside Date**"); provided, however, that a Party may not terminate this Agreement pursuant to this Section 3.4(b) if such Party is in breach of its obligations hereunder in any material respect and such breach is the sole reason that the Closing has not occurred by such date;

(c)    By Seller or Purchaser, if: (i) Seller enters into a definitive agreement with respect to an Alternative Bid; or (ii) the Bankruptcy Court enters an Order approving an Alternative Bid; or (iii) if Purchaser is not the successful bidder at the Auction; provided that, if Purchaser is the only back-up bidder, then Purchaser shall not be permitted to terminate this Agreement pursuant

---

[1] To be revised if the Sale Order will not be entered on February 24, 2016.

to this Section 3.4(c) until after the earlier of (A) the closing of an Alternative Transaction or (B) the Outside Date;

(d)      By Seller or Purchaser, if an Order is entered by a Governmental Authority of competent jurisdiction having valid enforcement authority permanently restraining, prohibiting or enjoining either Party from consummating the Transactions and such Order shall have become final and non-appealable or shall not have been vacated prior to the Outside Date;

(e)      By Purchaser or Seller, if the Sale Order has not been entered by the Bankruptcy Court on or before February 24, 2016[2];

(f)      By Purchaser or Seller, so long as the Party seeking to terminate the Agreement pursuant to this Section 3.4(f) is not in breach of its obligations under this Agreement in any material respect, upon a material breach of any covenant or agreement of the other Party set forth in this Agreement, or if any representation or warranty of Seller or Purchaser shall have been or becomes untrue in any material respect, in each case such that the conditions set forth in Section 9.1 or Section 9.2, respectively, as the case may be, could not be satisfied and such breach or untruth cannot be cured by the Outside Date.

3.5      Effect of Termination.

(a)      No termination of this Agreement pursuant to Section 3.4 shall be effective until notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made.  In the event that this Agreement is validly terminated as provided herein, this Agreement shall become wholly void and of no further force and effect without liability to Purchaser or Seller, or any of their respective Representatives, and each shall be fully released and discharged from any Liability or obligation after the date of such termination and such termination shall be without liability to Purchaser or Seller; provided, however, that (i) the parties hereto shall retain the right to pursue any remedies that they may have in contract, at law or in equity for any breach by a party of any of their respective representations, warranties, covenants or other agreements contained in this Agreement and (ii) the rights and obligations of the Parties under Sections 3.5, 7.5 and Article 11 of this Agreement shall survive any such termination and shall be enforceable hereunder.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser as follows as of the date of this Agreement:

4.1      Organization and Good Standing.  Seller is duly organized, validly existing, in good standing and duly qualified to transact business under the laws of the jurisdiction of its formation, and is duly qualified or licensed to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, except as described on Schedule 4.1 or where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and, subject to the limitations imposed on Seller as a result of having filed petitions for

---

[2] To be revised if the Sale Order will not be entered into tomorrow (2/24/16).

relief under the Bankruptcy Code, or pursuant to any Order entered by the Bankruptcy Court, Seller has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

4.2    <u>Title to Assets</u>.  Seller has good valid title to or interest in (as applicable) all of the Purchased Assets.  The Purchased Assets include all tangible assets, intangible assets and Intellectual Property that are necessary for the conduct of the Business immediately following the Closing Date in substantially the same manner as conducted by Seller prior to the commencement of the Bankruptcy Case.

4.3    <u>Authorization of Agreement</u>.  Subject to the entry of the Sale Order, Seller has full corporation, limited liability company or partnership power and authority to execute, deliver and perform each of the Transaction Documents to be executed or delivered by Seller in connection with the transactions contemplated therein.  The execution, delivery and performance of each of the Transaction Documents to be executed or delivered by Seller and the consummation by Seller of the transactions contemplated in this Agreement have been duly and validly approved by the directors, stockholders, managers, members and partners of Seller, as applicable, in compliance with applicable Laws and the Governing Documents of Seller.  The Transaction Documents when so executed and delivered by Seller shall constitute legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

4.4    <u>Real Property</u>.

(a)    To Seller's Knowledge, <u>Schedule 4.4(a)</u> sets forth a list of all material leases or other occupancy agreements entered into by Seller and pursuant to which Seller leases real property from any third party (individually, a "***Real Property Lease***" and collectively, the "***Real Property Leases***;" the subject real property leased thereunder, individually, a "***Leased Property***" and collectively, the "***Leased Properties***").

(b)    Seller has provided Purchaser with, or access to complete copies of all Real Property Leases together with all amendments, modifications, supplements, and restatements thereto.

(c)    To Seller's Knowledge, each of the Real Property Leases is in full force and effect and is the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to the applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  Seller does not own any real property and does not sublease any Leased Property.

- 17 -

4.5     <u>Tangible Personal Property; Capital Leases</u>.

(a)     <u>Schedule 4.5(a)</u> sets forth all leases of Tangible Personal Property that involve annual payments in excess of $25,000 and relate to personal property used by Seller in connection with the Business or to which Seller is a party or by which the properties or assets of Seller are bound (the "***Personal Property Leases***").

(b)     <u>Schedule 4.5(b)</u> sets forth all capital leases that involve annual payments in excess of $25,000 and relate to property used by Seller in connection with the Business or to which Seller is a party or by which the properties or assets of Seller are bound (the "***Capital Leases***").

4.6     <u>Intellectual Property</u>.

(a)     <u>Schedule 4.6(a)</u> sets forth a true and complete list of all issuances, registrations and applications for issuance or registration of Intellectual Property included in the Purchased Assets.

(b)     <u>Schedule 4.6(b)</u> sets forth a true and complete list of (i) all material Intellectual Property Licenses that are Purchaser Assumed Contracts (other than standard off-the-shelf, unmodified, commercially available computer software) and (ii) to Seller's Knowledge, all material oral Intellectual Property Licenses that are Purchaser Assumed Contracts, regardless of whether such Intellectual Property Licenses involve annual payments by or to Seller or an Affiliate of Seller.

(c)     With respect to all Intellectual Property used by Seller in connection with the Business, except as set forth on <u>Schedule 4.6(c)</u>:

(i)     Seller (A) exclusively owns all right, title and interest in and to, free and clear of all Liens (other than Permitted Liens), or (B) has a valid and enforceable right to use, pursuant to an Intellectual Property License set forth in <u>Section 4.6(b)</u>, all Intellectual Property used or held for use in connection with the operation of the Business as currently conducted, all of which rights shall survive unchanged upon the consummation of the Transactions.

(ii)     To Seller's Knowledge, the Intellectual Property is not the subject of any ownership, validity, use, or enforceability challenge or claim received by Seller in writing or, any outstanding Order restricting the use by Seller thereof or adversely affecting any of the rights of Seller thereto, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(iii)     To Seller's Knowledge, Seller has not received any written notice of any default or any event that with notice or lapse of time, or both, would constitute a default under any material Intellectual Property License that is a Purchaser Assumed Contract and to which Seller is a party or by which it is bound.  To Seller's Knowledge, no Person is infringing, diluting, misappropriating, or otherwise violating, any material Purchased Intellectual Property or any Intellectual Property exclusively licensed to Seller under an Intellectual Property License that is a Purchaser Assumed Contract.

- 18 -

(iv)   To Seller's Knowledge, neither Seller nor the operation of the Business as presently conducted is materially infringing, diluting, misappropriating, or otherwise violating any Intellectual Property rights of any other Person.  To Seller's Knowledge, there are no Legal Proceedings, pending or threatened, concerning any claim that Seller or the operation of the Business has materially infringed, diluted, misappropriated, or otherwise violated any material Intellectual Property of any other Person, and Seller has not received any written notice that Seller or the Business has materially infringed, diluted, misappropriated, or otherwise violated any Intellectual Property of any other Person (including any unsolicited demand or offer to license Intellectual Property rights of a third party).

4.7   Material Contracts.

(a)   Schedule 4.7(a) contains a true and complete list of Contracts of the following types to which Seller is a party or by which Seller is bound in connection with the Business or by which the Purchased Assets may be bound or affected and that are Purchaser Assumed Contracts (collectively with the Personal Property Leases, the Capital Leases and the Intellectual Property Licenses that are Purchaser Assumed Contracts, the "***Material Contracts***"):

(i)   to Seller's Knowledge, Contracts with any Affiliate or current or former officer or director of Seller;

(ii)   Contracts pursuant to which Seller grants to any Person any rights to represent Seller with respect to any product or act as agent for Seller in connection with the marketing, distribution or sale of any Business product;

(iii)   Contracts for the sale of any of the assets of the Business, other than in the ordinary course of business;

(iv)   Contracts relating to the acquisition by Seller of any operating business or the capital stock or other equity interests of any other Person;

(v)   Contracts containing a covenant that restricts Seller or any Affiliate of Seller from engaging in any line of business, conducting the Business in any geographic area, competing with any Person or hiring any Person;

(vi)   Contracts relating to incurrence of Indebtedness or the making of any loans, in each case involving amounts in excess of $10,000;

(vii)   Contracts relating to a joint venture of the Business or Seller; and

(viii)   Contracts for the employment of any individual on a full-time, part-time or consulting or other basis providing annual compensation in excess of $150,000.

(b)   To Seller's Knowledge, each of the Material Contracts is in full force and effect and is the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to

- 19 -

general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

4.8     <u>Employee Benefits</u>.

(a)     <u>Schedule 4.8(a)</u> sets forth all material Employee Benefit Plans.

(b)     True, correct and complete copies of each of the material Employee Benefit Plans have been made available to Purchaser.

(c)     Except as disclosed on <u>Schedule 4.8(c)</u>, each of the Employee Benefit Plans intended to qualify for tax-advantaged status under applicable Laws so qualifies.

(d)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) result in any payment becoming due to any employee of Seller; (ii) increase any benefits otherwise payable under any Employee Benefit Plan; or (iii) result in the acceleration of the time of payment or vesting of any such benefits, in each case, that would be required to be satisfied by Purchaser following the Closing.

4.9     <u>Labor</u>.

(a)     Except as set forth on <u>Schedule 4.9(a)</u>, Seller is not a party to any labor or collective bargaining agreement.

(b)     Except as set forth on <u>Schedule 4.9(b)</u>, to Seller's Knowledge there are no (i) strikes, work stoppages, work slowdowns or lockouts pending or threatened against or involving Seller, or (ii) unfair labor practice charges, grievances or complaints pending or threatened by or on behalf of any employee or group of employees of Seller, except in each case as would not reasonably be expected to have a Material Adverse Effect.

4.10    <u>Litigation</u>.    Except (a) as set forth on <u>Schedule 4.10</u>, (b) for matters before the Bankruptcy Court involving Seller or any of its Affiliates, and (c) any matters that will otherwise be resolved by the Sale Order without any Liability or restriction applicable to Purchaser or the Purchased Assets, there are no Legal Proceedings pending or, to Seller's Knowledge, threatened against Seller or relating to the Business or any of the Purchased Assets or Assumed Liabilities, before any Governmental Authority, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.11    <u>Financial Advisors</u>.    Except as set forth on <u>Schedule 4.11</u>, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the transactions contemplated by this Agreement.

4.12    <u>Accounts Receivable</u>.    To Seller's Knowledge, the Accounts Receivable of Seller: (a) have been legally and validly incurred pursuant to bona fide transactions in the ordinary course of business; (b) represent or will represent bona fide indebtedness incurred by the applicable account debtor; (c) are not subject to any set-offs or counterclaims that exceed $50,000; and (d) are fully collectible, net of the allowance for doubtful accounts contained in the financial statements of Seller, in the ordinary course of business in accordance with their terms

- 20 -

and assuming that the methods of collection practices and procedures used in collection of the accounts receivable are consistent with those historically used by Seller.

4.13    Tax Matters.

(a)      Seller has timely filed all Tax Returns that it was required to file.  All Taxes owed by Seller (whether or not shown or required to be shown on any Tax Return) have been paid. Seller currently is not the beneficiary of any extension of time within which to file any Tax Return.  No claim has ever been made by an authority in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to taxation by that jurisdiction.  There are no liens on any of the assets of Seller that arose in connection with any failure (or alleged failure) to pay any Tax.

(b)      Seller has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.

(c)      Seller does not expect any authority to assess any additional Taxes for any period for which Tax Returns have been filed.  There is no dispute or claim concerning any Tax Liability of Seller either (i) claimed or raised by and authority in writing or (ii) as to which Seller has Knowledge.  Schedule 4.13 lists all federal, state, local and non-U.S. income Tax Returns filed with respect to Seller for taxable periods ended on or after 2012, indicates those Tax Returns that have been audited, and indicate those Tax Returns that currently are the subject of audit.  Seller has delivered to Purchaser correct and complete copies of all income Tax Returns, examination reports and statements of deficiencies assessed against or agreed to by Seller since 2012.

(d)      None of the Assumed Liabilities is an obligation to make payment that is not deductible under Code §280G or a payment that would cause adverse tax consequences under Code §409A.  Seller (i) is not a party to any tax allocation or sharing agreement, (ii) has not been a member of an Affiliated Group filing a consolidated federal income Tax Return, and (iii) has no Liability for the Taxes of any Person under Reg. § 1.1502-6 (or any similar provision of state, local or non-U.S. Law), as a transferee or successor, by contract, or otherwise.  Seller is not or has not been a party to any "reportable transaction," as defined in Code § 6707A(C)(1) and Reg. § 1.6011-4(b).

4.14    No Undisclosed Liabilities.  Except (a) as disclosed pursuant to this Article 4 and the schedules related hereto; (b) as disclosed or reflected in Seller's most recent balance sheet; (c) as incurred in the ordinary course of business consistent with past practices since December 31, 2015; and (d) professional fees and expenses accrued in the Bankruptcy Case, Seller has no liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) that are or would reasonably be expected to be, individually or in the aggregate, material.

4.15    No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this Article 4 (as modified by the Schedules hereto), neither Seller nor any other Person makes any express or implied representation or warranty with respect to Seller,

the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by the Transaction Documents, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of their respective Representatives. Except for the representations and warranties contained in this Article 4 (as modified by the Schedules hereto), Seller expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or express warranty of merchantability or fitness for a particular purpose). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

5.1    Organization and Good Standing. Purchaser is duly organized, validly existing, in good standing and duly qualified to transact business under the laws of the jurisdiction of its formation, and is duly qualified or licensed to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary. Purchaser has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

5.2    Authorization of Agreement. Subject to the entry of the Sale Order, Purchaser has full corporation, limited liability company or partnership power and authority to execute, deliver and perform each of the Transaction Documents to be executed or delivered by Purchaser in connection with the transactions contemplated therein. The execution, delivery and performance of each of the Transaction Documents to be executed or delivered by Purchaser and the consummation by Purchaser of the transactions contemplated in this Agreement have been duly and validly approved by the directors, stockholders, managers, members and partners of Purchaser, as applicable, in compliance with applicable Laws and the Governing Documents of Purchaser. The Transaction Documents when so executed and delivered by Purchaser shall constitute legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3    No Violation; Consents. None of the execution and delivery by Purchaser of this Agreement or the Transaction Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (a) the Governing Documents of Purchaser, (b) any Contract or License to which Purchaser is a party or by which Purchaser or its properties or assets are bound, (c) any Order of any Governmental Authority applicable to Purchaser or by which any of the properties or assets of Purchaser are

bound or (d) any applicable Law, except in the case of clauses (b), (c) and (d) as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.4     Litigation.  There are no Legal Proceedings pending or, to the Knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a Material Adverse Effect.

5.5     Financial Capability.  Purchaser (a) will have at the Closing sufficient funds available to pay the Purchase Price and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement, and (b) will have at the Closing the resources and capabilities (financial or otherwise) to perform its obligations hereunder.

5.6     Bankruptcy.   There are no bankruptcy, reorganization or arrangement proceedings pending against, being contemplated by, or to the Knowledge of Purchaser, threatened against, Purchaser.

5.7     Financial Advisors.  Except as set forth on Schedule 5.7, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated hereunder and no Person is entitled to any fee or commission or like payment in respect thereof which would be payable by Seller.

5.8     Condition of the Business and Purchased Assets.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Article 4 hereof (as modified by the Schedules hereto as supplemented or amended in accordance with Section 7.9), and Purchaser acknowledges and agrees that, except for the representations and warranties contained herein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis.  Purchaser further represents that neither Seller nor any of its Affiliates or any other Person will have or be subject to any liability to Purchaser resulting from Purchaser's use of any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller or any of its Affiliates, the Business or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and neither Seller, nor any of its Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or Purchaser's use of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its Representatives, in connection with the sale of the Business and the Transactions.  Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Business and, in making the determination to proceed with the Transactions, Purchaser has relied solely on the results of its own independent investigation.

5.9     OFAC.  Purchaser is not acting, directly or indirectly for, or on behalf of, any person, group, entity or nation named by any federal executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "**Executive Order**")) or the United States

Treasury Department as a terrorist, "***Specially Designated National and Blocked Person***," or other banned or blocked person, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control ("***OFAC***"), and is not engaging in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of, any such person, group, entity or nation.  Purchaser is in compliance with all laws, statutes, rules and regulations of any federal, state or local governmental authority in the United States of America applicable to Purchaser and all beneficial owners of Purchaser with respect to or arising out of the requirements of the Executive Order and other similar requirements contained in the rules and regulations of OFAC and in enabling legislation or other federal executive orders in respect thereof.

## ARTICLE 6
## BANKRUPTCY COURT MATTERS

6.1    <u>Alternative Transaction</u>.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller, in consultation with the Secured Lender and Committee, of higher or better competing bids, of any sale, transfer, liquidation or disposition of the Business or assets of Seller, or of a plan of reorganization or liquidation with respect to the Business or assets of Seller (each an "***Alternative Bid***").  From the date hereof (and any prior time) and until the earlier of: (i) the consummation of the Transactions and (ii) the conclusion of any bid process described in the Bidding Procedures Order, Seller is permitted to cause its Representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and Representatives) in compliance with the Bidding Procedures Order in connection with any sale or other disposition of the Purchased Assets and the Business.  In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets or the Business and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable Law, including supplying information relating to the Business and the assets of Seller to prospective purchasers.

(b)    Seller shall use commercially reasonable efforts to promptly provide, or identify and make available to Purchaser, any non-public information concerning Seller, the Purchased Assets or the Business provided to any other bidder or prospective purchaser after the date hereof which was not previously provided to Purchaser.

6.2    <u>Bankruptcy Court Approval</u>.  Seller and Purchaser acknowledge that this Agreement and the consummation of the transactions contemplated hereby are subject to Bankruptcy Court approval.  Seller and Purchaser acknowledge that (a) each must comply with the Bidding Procedures Order and (b) Purchaser must provide adequate assurance of future performance within the meaning of Section 365(f)(2)(B) of the Bankruptcy Code with respect to the Purchaser Assumed Contracts.  With respect to each Purchaser Assumed Contract, Purchaser shall provide adequate assurance as required under the Bankruptcy Code of the future performance by Purchaser of each Purchaser Assumed Contract.  Purchaser agrees that it will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Purchaser

- 24 -

Assumed Contracts, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information, and other documents or information for filing with the Bankruptcy Court and making Purchaser's Representatives available to testify before the Bankruptcy Court.

6.3    Sale Order.  Subject to Seller's right to pursue an Alternative Transaction, Seller will use reasonable efforts to consummate the transactions contemplated hereby by seeking entry of the Sale Order, with one or more appropriate motion or motions and the entry of appropriate Orders of the Bankruptcy Court (all such motions and Orders being in form and substance reasonably satisfactory to Seller and Purchaser).

## ARTICLE 7
## COVENANTS

7.1    Access to Information.  Seller agrees that, prior to the Closing Date, Purchaser shall be entitled, through its Representatives, to (a) make such investigation of the properties, businesses and operations of the Business and (b) make such examination of the books and records of the Business, the interests owned by Seller in the Purchased Assets and the Assumed Liabilities as Purchaser reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and Seller shall cooperate fully therein.  Purchaser and its Representatives shall cooperate with Seller and its Representatives and shall use their reasonable efforts to minimize any disruption to the Business in connection with such investigation and examination.  Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Seller to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which Seller is bound.  Purchaser shall not contact any vendor or other strategic partner of Seller prior to Closing without Seller's prior written consent.

7.2    Conduct of the Business Pending the Closing.

   (a)    Subject to any limitations imposed on Seller by the Bankruptcy Court and except (1) as set forth on Schedule 7.2(a), (2) as required by applicable Law, (3) as otherwise expressly contemplated by this Agreement, or (4) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Seller shall:

      (i)    conduct the Business in the ordinary course of business in all material respects;

      (ii)    use commercially reasonable efforts to (A) preserve the present business operations, organization and goodwill of the Business, and (B) preserve the present relationships with Persons having business dealings with Seller (including customers and suppliers of the Business); and

      (iii)    comply in all material respects with applicable Laws.

   (b)    Subject to any limitations imposed on Seller by the Bankruptcy Court and except (1) as required by applicable Law, (2) as otherwise contemplated by this Agreement, or (3) with

- 25 -

the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Seller shall not:

> (i)      Sell, lease, transfer any of the Purchased Assets (other than the sale of Inventory in the ordinary course of business) or subject any of the Purchased Assets to any Lien, except for Permitted Liens; or

> (ii)     Modify, amend, reject, waive any rights under or terminate any Purchaser Assumed Contract; or

> (iii)    agree to do anything prohibited by this Section 7.2.

7.3     Consents.     Seller shall use commercially reasonable efforts, and Purchaser shall cooperate with Seller, to obtain at the earliest practicable date all consents and approvals required to consummate the Transactions, including the consents and approvals listed on Schedule 9.1(d); provided, however, that neither Seller nor Purchaser shall be obligated to (a) pay any consideration therefore to any third party from whom consent or approval is requested, or (b) agree to any restrictions on its ability to operate the Business or the Purchased Assets or hold or exercise ownership over the Purchased Assets, or initiate any litigation or Legal Proceedings to obtain any such consent or approval.

7.4     Appropriate Action; Filings.     Through the Closing Date, Seller and Purchaser shall cooperate with each other and use (and shall cause their respective controlled Affiliates to use) commercially reasonable efforts: (a) to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable on its part under this Agreement, applicable Law or otherwise to consummate and make effective the Transactions; (b) to obtain promptly from any Governmental Authority any Orders or Licenses required to be obtained by Seller or Purchaser or any of their respective Affiliates in connection with the authorization, execution, delivery and performance of this Agreement and the consummation of the Transactions; (c) to promptly make all necessary filings and thereafter make any other required submissions with respect to this Agreement and prompt consummation of the Transactions required under any applicable Law; and (d) to provide prompt notification to the other Party of any actions pursuant to clauses (a)-(c) of this Section 7.4; provided, however, that nothing in this Section 7.4 shall be construed as altering the rights or obligations of Seller under Sections 7.1, 7.2 and 7.3; and provided further, that Seller shall not be obligated to pay any consideration or incur any costs to obtain any approvals or consents from third parties, whether or not they may be necessary, proper or advisable to consummate the Transactions.

7.5     Confidentiality.   Purchaser acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under Section 7.1, and is subject to the terms of the Confidentiality Agreement, dated February 15, 2016, between Seller and Purchaser (the "**_Confidentiality Agreement_**"), the terms of which are incorporated herein by reference.  Purchaser acknowledges and understands that this Agreement may be made available by Seller to prospective bidders and that such disclosure shall not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise. The provisions of this Section 7.5 shall survive the Closing.

7.6     Preservation of Records; Cooperation.  Seller and Purchaser shall (and shall cause their controlled Affiliates to) preserve and keep in their possession all records held by them on and after the date hereof relating to the Purchased Assets for a period of two (2) years or such longer period as may be required by applicable Law (provided, however, that in no event shall Seller be required to preserve such records after the Bankruptcy Case is closed, converted or dismissed) and shall make such records and personnel available to the other Party as may reasonably be required by such Party, including in connection with any insurance claims or Legal Proceedings involving the Purchased Assets, or any governmental investigations of Seller or Purchaser or any of their respective Affiliates related to the Purchased Assets or in order to enable Seller or Purchaser or any of their respective Affiliates to comply with their respective obligations under the Transaction Documents; provided, further, that in no event shall either Party be obligated to disclose any information which would jeopardize any privilege available to such Party or any of its Affiliates relating to such information or which would cause such Party or any of its Affiliates to breach a confidentiality obligation to which it is bound.  Purchaser further acknowledges that Seller shall be entitled to copy any such records, at Seller's sole cost and expense, and to retain copies of such records.  After the expiration of any applicable retention period, before Purchaser shall dispose of any of such records; at least sixty (60) days' prior written notice to such effect shall be given by Purchaser to Seller or its successors (or a Person designated by Seller) and Seller or its successors (or a Person designated by Seller) shall have the opportunity (but not the obligation), at its sole cost and expense, to remove and retain all or any part of such records as they may in their sole discretion select.  In the event Seller wishes to destroy any records after the Bankruptcy Case is closed, before Seller shall dispose of any of such records, at least thirty (30) days' prior written notice to such effect shall be given by Seller to Purchaser or its successors (or a Person designated by Purchaser) and Purchaser or its successors (or a Person designated by Purchaser) shall have the opportunity (but not the obligation), at its sole cost and expense, to remove and retain all or any part of such records as it may in its sole discretion select.

7.7     Supplements and Amendments to Schedules.  The Seller will, by written notice to or upon request of Purchaser, from time to time prior to the Closing Date, supplement or amend the Schedules provided pursuant to Article 4 in form and substance acceptable to Purchaser, including in response to any changes or updates to Schedules 1.1(b), 1.2(m), 5.7, 7.2(a) and 8.1(a) made by Purchaser.  Such supplements or amendments shall be effective to cure and correct, for all purposes, any breach of any representation or warranty which would have existed if Seller had not made such supplements or amendments.  All references to Schedules that are supplemented or amended pursuant to this Section 7.7 shall be deemed to be a reference to such Schedule as supplemented or amended.

7.8     Further Assurances.  Seller and Purchaser shall use their commercially reasonable efforts to (a) take all actions necessary or appropriate to consummate the Transactions and (b) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transactions.

7.9     Adequate Assurance.  Purchaser will timely provide such information to Seller, as Seller believes is reasonably necessary to provide "adequate assurance," as that term is used in Section 365 of the Bankruptcy Code, with respect to the Purchaser Assumed Contracts.

**ARTICLE 8**
**EMPLOYEE AND EMPLOYEE BENEFITS MATTERS;**
**TAX MATTERS; OTHER AGREEMENTS**

8.1     Employment.

(a)     *Transferred Employees*.  Schedule 8.1 sets forth a list of Seller's employees that Purchaser desires to hire.  Subject to the terms and conditions of this Section 8.1, Purchaser shall offer employment in a written offer letter to each employee identified in Schedule 8.1, to the extent such person is an active employee of Seller or its Affiliates or on an approved leave of absence as of such date.  Any such offer by Purchaser shall be (i) contingent upon the issuance of the Sale Order of the Bankruptcy Court and (ii) based on terms and conditions of employment similar to those provided by Seller prior to Closing (with credit for past service with respect to title, compensation and benefits).  Each employee who (i) accepts Purchaser's offer, (ii) executes and delivers an offer letter in the form delivered by Purchaser and (iii) actually performs services for Purchaser on the first Business Day following the Closing Date, shall be deemed a "***Transferred Employee***."  The foregoing will not apply to Transferred Employees who are shareholders of Seller (or their affiliates) (collectively, the "***Insider Employees***") who are offered continued employment based on terms agreed upon by Purchaser and such Insider Employees.

(b)     *Standard Procedure*.  Pursuant to the "***Standard Procedure***" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320, (i) Purchaser and Seller shall report on a predecessor/successor basis as set forth therein and (ii) Purchaser will undertake to file (or cause to be filed) a Form W-2 for each such Transferred Employee with respect to the portion of the year during which such Employee is employed by Purchaser that includes the Closing Date, excluding the portion of such year that such Employee was employed by Seller.

8.2     Employee Matters.

(a)     *Accrued Vacation*.  Purchaser shall be responsible for all Liabilities with respect to Transferred Employees attributable to their accrued and unused vacation, sick days, personal days and paid-time-off through the Closing Date.

(b)     *Accrued Wages and Bonus*.  Seller shall be and remain solely responsible to pay all accrued and unpaid wages and bonuses of Transferred Employees through the Closing Date.

(c)     *Severance*.  Seller shall be and remain solely responsible for all termination and severance Liabilities and obligations arising under any plan, program, policy or agreement of or with Seller or its Affiliates which arise on or prior to the Closing Date.

(d)     *COBRA*.  Purchaser shall provide health care continuation coverage in accordance with ERISA or Section 4980B of the Code to all Employees as of the Closing Date and their respective qualified beneficiaries as of the Closing Date, all former Employees and their qualified beneficiaries who are entitled to such coverage as of the Closing Date under the Employee Benefit Plans, and all other "affected employees" as defined for purposes of ERISA and Section 4980B of the Code and their qualified beneficiaries.

- 28 -

(e)     *Employment and Benefit Changes*.  Nothing contained in <u>Section 8.1</u> or elsewhere in this Agreement shall be construed to prevent the termination of employment of any Transferred Employee or any guaranty of or change in the employee benefits available to any Transferred Employee.

8.3     <u>Collective Bargaining Agreement</u>.  Prior to the Closing Date, Seller and Purchaser shall cooperate with each other in the negotiation of any new collective bargaining agreement or of any amendment to or verification of any existing collective bargaining agreement or of any .collective bargaining agreement renewal; provided, however, that the execution of any new collective bargaining agreement or any amendment to or verification of any existing collective bargaining agreement or of any collective bargaining agreement renewal shall not be a condition to the obligations of any party to consummate the transactions contemplated by this Agreement.

8.4     <u>Tax Matters</u>.

(a)     *Transfer Taxes*.    To the extent not exempt under Section 1146(c) of the Bankruptcy Code in connection with the Chapter 11 Cases, all sales, transfer, filing, recordation, registration, documentary, stamp and similar Taxes incurred in connection with the consummation of the Transactions (collectively, "***Transfer Taxes***"), whether levied on Purchaser or Seller, shall be paid by Purchaser.  On or before the Closing Date, Purchaser shall prepare at Purchaser's expense, with Seller's cooperation, any necessary Tax Returns and other documentation with respect to any Transfer Taxes, and the Party required by law to file such Tax Return shall timely do so.  The costs of preparing such Tax Returns and other documentation with respect to any Transfer Taxes shall be borne by Purchaser.

(b)     *Allocation of Taxes*.  Whenever it is necessary to determine liability for Taxes in respect of the Seller, the Purchaser or the Purchased Assets for a Straddle Period, the portion of such Tax which relates to the portion of the Straddle Period ending on the Closing Date shall (i) in the case of any Taxes, other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire Straddle Period, multiplied by a fraction, the numerator of which is the number of days in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period; and (ii) in the case of any Tax based upon or related to income or receipts, be deemed equal to the amount which would be payable on the basis of an interim closing of the books as of the end of the Closing Date.  In the event of a disagreement with respect to any Tax Returns under this <u>Section 8.4(b)</u>, the disagreeing Party shall promptly notify the other Party in writing of any items of the Tax Return that are not reasonable in such Party's good faith determination ("***Objection to Tax Return***").  If no Objection to Tax Return is raised in writing by either Party, then the determination shall be final and binding on all Parties.  If an Objection to Tax Return is raised, the Parties shall cooperate in good faith to reach a mutually agreeable resolution which shall be binding on all Parties.  If the Parties are unable to reach a resolution within thirty (30) days of a notice of Objection to Tax Return, then any disputed items shall be referred to the Accounting Referee for resolution, and the determination of the Accounting Referee shall be final and binding on the Parties.  The fees and expenses of the Accounting Referee shall be paid fifty percent (50%) by Purchaser and fifty percent (50%) by Seller.

- 29 -

(c)     *Tax Claims*.  Seller, at its expense, shall have the right, but not the obligation, to control the conduct of the portion of the defense of any audit, claim, proceeding, investigation, or other controversy relating solely to Taxes ("***Tax Claim***") for which Seller is liable pursuant to Section 1.4; provided, however, that Seller will not have the right to settle any such Tax Claim if the resolution or determination of such Tax Claim is reasonably likely to adversely affect Purchaser without first obtaining Purchaser's written consent, such consent to not be unreasonably withheld, conditioned or delayed.  Purchaser shall control the conduct of all other Tax Claims; provided, however, that if such Tax Claim, if successful, could reasonably be expected to result in any Tax for which Seller may be responsible under this Agreement, Purchaser shall (i) promptly notify Seller in writing of such claim, (ii) notify Seller of any significant developments regarding such claim, (iii) consider in good faith recommendations of Seller in connection with such claim, and (iv) not settle any such claim without first obtaining Seller's written consent, such consent to not be unreasonably withheld, conditioned or delayed (provided however that a failure to give any such notice to Seller shall not affect Seller's obligations under this Agreement except to the extent that Seller has been actually prejudiced as a result of such failure).

(d)     *Cooperation*.  Seller, on the one hand, and Purchaser, on the other, shall provide each other, with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Taxing Authorities.  Any information obtained under this Section 8.4 shall be kept confidential except to the extent disclosure of such information may be necessary or appropriate in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding.

(e)     *Effect of Tax Payments*.  Any reimbursement payment to be made pursuant to this Agreement shall be treated by the Parties as an adjustment to the Purchase Price for all Tax purposes.

**ARTICLE 9**
**CONDITIONS TO CLOSING**

9.1     Conditions Precedent to Obligations of Purchaser.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser, in its reasonable discretion, in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Seller set forth in this Agreement shall be true and correct at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date); provided, however, that in the event of a breach of a representation or warranty other than a representation or warranty qualified by materiality or Material Adverse Effect, the condition set forth in this Section 9.1(a) shall be deemed satisfied

- 30 -

unless the effect of all such breaches of representations and warranties taken together results in a Material Adverse Effect; and Purchaser shall have received a certificate signed by an authorized officer of Seller (in form and substance reasonably satisfactory to Purchaser), dated the Closing Date, to such effect;

(b)     Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the forgoing effect;

(c)     Seller shall have paid in full or otherwise satisfied all Cure Costs less than or equal to the Cure Cost Threshold with respect to the Purchaser Assumed Contracts set forth on Schedule 1.l(b) prior to or on the Closing Date;

(d)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 3.2; and

(e)     all material consents (or in lieu thereof waivers) described on Schedule 9.1(e) (i) shall have been obtained, (ii) shall be in form and substance reasonably satisfactory to Purchaser, (iii) shall not be subject to the satisfaction of any condition that has not been satisfied or waived and (iv) shall be in full force and effect, except where the failure to obtain any such consent (or in lieu thereof waiver) could not reasonably be expected, individually or in the aggregate with other such failures, to result in a Material Adverse Effect.

9.2     Conditions Precedent to Obligations of Seller.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller, in its reasonable discretion, in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchaser set forth in this Agreement shall be true and correct at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date); provided, however, that in the event of a breach of a representation or warranty other than a representation or warranty qualified by materiality or Material Adverse Effect, the condition set forth in this Section 9.2(a) shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a Material Adverse Effect, and Seller shall have received a certificate signed by an authorized officer of Purchaser (in form and substance reasonably satisfactory to Seller), dated the Closing Date, to such effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(c)     Purchaser shall have paid in full or otherwise satisfied all Cure Costs in excess of the Cure Cost Threshold with respect to the Purchaser Assumed Contracts set forth on Schedule 1.l(b) prior to or on the Closing Date; and

- 31 -

(d)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 3.3.

9.3     Conditions Precedent to Obligations of Purchaser and Seller.  The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Law or Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions; and

(b)     the Bankruptcy Court shall have entered the Sale Order.

9.4     Frustration of Closing Conditions.  Neither Seller nor Purchaser may rely on the failure of any condition set forth in Section 9.1, Section 9.2 or Section 9.3, as the case may be, if such failure was caused primarily by such Party's failure to comply with any provision of this Agreement.

## ARTICLE 10
## LIMITATIONS

10.1     Purchaser's Review.

(a)     *No Reliance*.  Purchaser has had the opportunity to ask questions, and has received sufficient answers, in connection with its decision to enter into this Agreement and to consummate the Transactions.  In connection with the execution and delivery of this Agreement and the consummation of the Transactions, Purchaser has not relied upon any representation, warranty, statement, advice, document, projection, or other information of any type provided by Seller or its Affiliates or any of their respective Representatives, except for those representations and warranties expressly set forth in Article 4.  In deciding to enter into this Agreement, and to consummate the Transactions, Purchaser has relied solely upon its own knowledge, investigation, judgment and analysis (and that of its Representatives) and not on any disclosure or representation made by, or any duty to disclose on the part of, Seller or its Affiliates or any of their respective Representatives, other than the express representations and warranties of Seller set forth in Article 4.

(b)     *Limited Duties*.  Any and all duties and obligations which any Party may have to any other Party with respect to or in connection with the Purchased Assets, this Agreement or the Transactions are limited to those specifically set forth in this Agreement, the Transaction Documents or any instrument delivered hereunder or thereunder.  Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement, the Transaction Documents or any instrument delivered hereunder or thereunder on the basis of any legal or equitable principle or on any other basis whatsoever.

10.2     No Consequential or Punitive Damages.  NO PARTY (NOR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE

- 32 -

OTHER PARTY (NOR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

## ARTICLE 11
## MISCELLANEOUS

11.1    <u>Survival of Representations, Warranties, Covenants and Agreements</u>.    The representations and warranties of any Party made herein, in any Transaction Document or in any other instrument delivered pursuant to this Agreement shall terminate at the Closing, or, subject to <u>Section 3.5</u>, upon termination of this Agreement pursuant to <u>Section 3.4</u>, and, following the Closing or the termination of this Agreement, as the case may be, and notwithstanding anything to the contrary contained herein or pursuant to applicable Law other than <u>Section 3.5</u>, there shall be no Liability in respect thereof on the part of any Party or any of its Representatives other than pursuant to <u>Section 3.5</u>.    Except with respect to covenants or agreements which are to be performed on or prior to the Closing, all covenants and agreements contained in this Agreement shall survive the Closing in accordance with their respective terms; provided, that any covenant or agreement contained herein whose survival is not limited by its terms shall survive until fully performed in accordance with its terms.

11.2    <u>Remedies</u>.  The Parties acknowledge and agree that: (i) each Party recognizes that if such Party breaches or refuses to perform any such covenant, monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries, (ii) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants, (iii) if any Legal Proceeding is brought by the non-breaching Party or Parties to enforce such covenants, the Party in breach shall waive the defense that there is an adequate remedy at law, (iv) each Party agrees to waive any requirement for the security or posting of any bond in connection with any Legal Proceeding seeking specific performance of, or to enjoin the violation of, such covenants, and (v) each Party agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.  In the event of any breach prior to the Closing by Seller of any of Seller's agreements, representations, or warranties contained herein or in the Bidding Procedures Order or the Sale Order, including any breach that is material or willful, Purchaser's sole and exclusive remedy shall be to exercise Purchaser's rights to terminate this Agreement pursuant to <u>Section 3.4</u> and Purchaser shall not have any further cause of action for damages, specific performance or any other legal or equitable relief against Seller with respect thereto.  Notwithstanding the foregoing and anything to the contrary in this Agreement, Purchaser may seek specific performance in order to require Seller to close the transactions contemplated by this Agreement.

11.3    <u>Expenses</u>.  Except as otherwise set forth in this Agreement, each Party shall bear its own expenses (including attorneys' fees) incurred in connection with the negotiation and execution of

- 33 -

the Transaction Documents; provided, however, Purchaser shall bear sole responsibility for any governmental charges relating to any UCC-3 filing fees, DOT, filing fees and other amounts payable in respect of transfer filings in connection with the transactions contemplated by this Agreement.

11.4   <u>Non-Recourse</u>.   The Parties acknowledge and agree that no past, present or future Representative or Affiliate of the Parties to this Agreement, in such capacity, shall have any liability for any obligations or liabilities of Purchaser or Seller, as applicable, under this Agreement or for any claim based on, in respect of, or by reason of, the Transactions.

11.5   <u>Submission to Jurisdiction</u>.

(a)   Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes among the Parties which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Legal Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and shall receive notices at such locations as indicated in <u>Section 11.10</u>; provided, however, that if the Bankruptcy Case has been fully and finally dismissed and the Bankruptcy Court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Northern District of Illinois sitting in Cook County.

(b)   The Parties hereby unconditionally and irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any dispute arising out of or relating to this Agreement or any of the Transactions brought in any court specified in subsection (a) above, or any defense of inconvenient forum for the maintenance of such dispute.   Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)   Each of the Parties hereby consents to process being served by any Party in any Legal Proceedings by the mailing of a copy thereof in accordance with the provisions of <u>Section 11.10</u>; provided, however, that such service shall not be effective until the actual receipt thereof by the Party being served.

11.6   <u>Waiver of Jury Trial</u>.   THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).   EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER

- 34 -

AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.6</u>.

11.7    <u>Time of Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

11.8    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement (including the Schedules and Exhibits hereto) and the other Transaction Documents represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersede all prior discussions and agreements between the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

11.9    <u>Governing Law</u>.  THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, AND ANY CLAIM OR CONTROVERSY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT OR AS AN INDUCEMENT TO ENTER INTO THIS AGREEMENT), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED, AND DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF ILLINOIS (WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

11.10   <u>Notices</u>.    All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective

- 35 -

Parties at the addresses indicated below (or at such other address for a Party as shall be specified in a notice given in accordance with this <u>Section</u>):

If to Seller:

LB Steel, LLC
c/o Development Specialists, Inc.
70 West Madison Street
Chicago, Illinois 60602
Attention: Patrick O'Malley
Phone: 312-263-4141
Fax: 312-263-1180
Email: pomalley@dsi.biz

With a copy to:

Perkins Coie LLP
131 South Dearborn Street
Suite 1700
Chicago, IL 60603
Attention: Ken Crane, Esq.
Phone: (312) 324-8688
Fax: (312) 324-9688
E-mail: kcrane@perkinscoie.com

If to Purchaser:

LB Metals, LLC
c/o Albern Investments LLC
666 Dundee Rd.
Suite 401
Northbrook, IL 60062

Attention: Shari Gamer
Phone: (847) 291-1400 ext. 35
Fax: (847) 291-9273
Email: shgamer@pbgltd.com

With a copy to:

Bryan Cave LLP
161 North Clark Street
Suite 4300
Chicago, IL 60601
Attention: Eric S. Prezant, Esq.
Phone: (312) 602-5033
Fax: (312) 602-5050
Email: eric.prezant@bryancave.com

- 36 -

11.11   Severability.  If any term or provision of this Agreement is invalid, illegal or incapable of being enforced by Law or public policy, all other terms and provisions hereof shall nevertheless remain in full force and effect so long as the legal substance of the Transactions is not affected in any manner materially adverse to any Party.  Upon such determination that any term or provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

11.12   No Right of Set-Off.  Purchaser for itself and for its Affiliates, successors and assigns hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Purchaser or any of its Affiliates, successors and assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.  Seller, for itself and for its Affiliates, successors and assigns hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Seller or any of its Affiliates, successors and assigns have or may have with respect to any payments to be made by Seller pursuant to this Agreement or any other document or instrument delivered by Seller in connection herewith.

11.13   Binding Effect; Assignment.  This Agreement shall be binding solely upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a Party to this Agreement except to the extent provided in Section 11.4.  No assignment of this Agreement or of any rights or obligations hereunder may be made by any Party (by operation of law or otherwise) without the prior written consent of the other Party and any attempted assignment without the required consents shall be void; provided, however, that (a) prior to the Closing, Purchaser may assign this Agreement and any or all rights or obligations hereunder (including Purchaser's right to purchase the Purchased Assets and assume the Assumed Liabilities) to any Affiliate of Purchaser and (b) after or in connection with the Closing, Purchaser (or its permitted assignee) shall have the right to assign its rights and/or delegate its obligations hereunder (i) to any Affiliates, (ii) to any financing sources for collateral purposes or (iii) to any subsequent purchaser of all or any portion of the stock or assets of Purchaser or the Business.  Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

11.14   Headings.  The Article and Section headings in the Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

11.15   Counterparts.  This Agreement may be executed and delivered (including by electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.16   Interpretation.  The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.  The definitions contained in this Agreement are

- 37 -

applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  Any reference in this Agreement to "$" shall mean United States dollars. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.  Any agreement, instrument, statute or regulation defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument, statute or regulation as from time to time amended, modified or supplemented including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes or regulations) by succession of comparable successor statutes or regulations and references to all attachments thereto and instruments incorporated therein.  References to a Person are also to its successors and permitted assigns.  All Article and Section references herein are to Articles and Sections of this Agreement, unless otherwise specified.   All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter set forth in any Schedule annexed hereto shall be deemed to be referred to and incorporated in all other Schedules to which such matter's application or relevance to a representation or warranty in any other Section of the Agreement is reasonably apparent on its face.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.  This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if all Parties had prepared it and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

[The Remainder of This Page Is Intentionally Left Blank]

119236-0001/129971503.7

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its respective officers thereunto duly authorized, as applicable, all as of the date first above written.

**SELLER:**

LB STEEL, LLC


By:_____
Name: _____
Title:_____




**PURCHASER:**

LB METALS, LLC, an Illinois limited liability company

By:     Albern Investments LLC, its Manager

By:_____
Name: _____
Title:_____

# SCHEDULE 1.0

# SELECT DEFINITIONS

"Accounts Receivable" means all accounts receivable, including progress billings, and notes receivable and other rights to payment (whether current or noncurrent), including credit card receivables, whether or not reflected in the books of Seller as of the Closing Date, including in respect to goods shipped, products sold, licenses granted, services rendered or otherwise associated with the Business, including the Warren Business, and all causes of action specifically pertaining to the collection of the foregoing.

"Adjustment Date" means the first Business Day after the Final Working Capital Adjustment Worksheet are finally determined in accordance with Section 2.5.

"Affiliate" (and, with a correlative meaning "affiliated") means, with respect to any Person, any direct or indirect subsidiary of such Person, and any other Person that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such first Person.  As used in this definition, "control" (including with correlative meanings, "controlled by" and "under common control with") means possession, directly or indirectly, of power to direct or cause the direction of the management or policies (whether through ownership of securities or partnership or other ownership interests, by Contract or otherwise).

"Alternative Bid" has the meaning set forth in Section 6.1.

"Alternative Transaction" means one or more agreements to sell, transfer, or otherwise dispose of any material portion of the Purchased Assets in a transaction or series of transactions (other than in the ordinary course of business) with one or more Persons, other than Purchaser, pursuant to an Alternative Bid that actually closes.

"Assignable Contract" means any Contract subject to the Bankruptcy Case to which Seller is a party that Seller is permitted under the Bankruptcy Code to sell or assign, other than an Employee Benefit Plan.

"Auction" has meaning specified in the Bidding Procedures Order.

"Bankruptcy Case" means the Chapter 11 case commenced by Seller on October 18, 2015, Case No 15-35358.

"Base Current Assets Amount" has the meaning set forth in Section 2.4(a).

"Bidding Procedures Order" means the Final Order of the Bankruptcy Court that was entered in the Bankruptcy Case on January 5, 2016 [Docket No. 208], setting forth the bidding procedures for the Auction.

"Books and Records" has the meaning set forth in Section 1.1(h).

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in Chicago, Illinois are authorized or required by Law to close.

"Cash" means the aggregate amount of the cash and cash equivalents held by Seller and all rights of Seller in respect of bank and brokerage accounts and lock boxes in their names or held on its behalf including, without limitation, the utility deposit account numbered 1500003069 held with MB Financial Bank, net of all "cut" but un-cashed checks outstanding, plus the amount of all marketable securities owned by Seller, in each case as of the close of business on the Closing Date.

"Closing Date" has the meaning set forth in Section 3.1 hereof.

"Closing Date Current Assets Adjustment Amount" means the amount (positive or negative) by which the Closing Date Estimated Current Assets Amount exceeds or is less than the Base Current Assets Amount.

"Closing Date Estimated Current Assets Amount" has the meaning set forth in Section 2.4(b).

"COBRA" means the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code any of any similar state law.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee" means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case.

"Contract" means any legally binding contract, purchase order, sales order, indenture, note, bond, loan, instrument, lease, mortgage, commitment or other agreement.

"Contract Rights" means all rights, claims, benefits and remedies with respect to any Contract or other consensual and legally binding obligation between Seller, on the one hand, and any other Person, on the other hand assigned to Purchaser pursuant to the terms of this Agreement.

"Cure Costs" means, the amounts which must be paid and obligations that otherwise must be satisfied, including pursuant to Section 365(b)(I)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of any Purchaser Assumed Contracts.

"Cure Cost Threshold" means, the initial one hundred thousand dollars ($100,000) paid by Seller to satisfy Cure Costs under the terms of this Agreement.

"Current Asset Components" means Accounts Receivable, Inventory - Plate and Inventory Non-Plate as set forth on Exhibit 2.4.

"Deposits" has the meaning set forth in Section 1.1(c).

"Employee Benefit Plans" means all employment benefit plans (as defined in Section 3(3) of ERISA), all employment or individual compensation agreements, and all other plans, policies, agreements, payroll practices or arrangements providing any bonus, incentive, retention, equity

or equity based compensation, deferred compensation, stock purchase, severance pay, disability, welfare benefit, workers compensation plans, pension benefit, life insurance, medical insurance, fringe benefits, educational assistance, tax gross up, change in control, or other material employee benefit, in each case as to which Seller has any Liability as of the Closing Date with respect to any current or former officers, employees or directors of Seller or any Subsidiary or Seller Affiliates, and shall specifically include all Liabilities of Seller and any Subsidiary or Seller Affiliates under Title IV of ERISA including with respect to the Topeka Division of LB Steel, LLC 401(k) Plan, the LB Steel, LLC 401(k) Plan for Union Employees, the LB Steel, LLC Non-Union 401(k) Profit Sharing Plan and any other single employer plan, multiemployer plan or multiple employer plan (and any trusts, 501(c)(9) organizations, insurance (including fiduciary insurance), administrative or other service contracts relating thereto).

"Employee Obligations" means any obligations with respect to any accrued and unused vacation, sick and personal days, paid-time-off and the employer's share of any payroll Taxes with respect to the Transferred Employees as of the Closing Date; provided, however, the definition of "Employee Obligations" does not include any Employee Benefit Plans.

"Environmental Laws" all applicable Laws relating to pollution or protection of natural resources or the environment, or the generation, use, treatment, storage, handling, transportation or release of, or exposure to, Hazardous Materials, including, without limitation, the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), Safe Drinking Water Act (42 U.S.C. § 3000(f) et seq.), Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), Clean Air Act (42 U.S.C. § 7401 et seq.), Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Estate" means the estate created in the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code.

"Estimated Working Capital Adjustment Worksheet Certificate" means (a) the estimated Working Capital Spreadsheet of the of Seller in forma of Exhibit 2.4 to the Agreement as of 12:01 a.m. on the Closing Date prepared by Seller in good faith using (i) the books and records of the Seller and (ii) the best estimates of Seller based upon all relevant information then available to Seller on a consistent basis and applying the same accounting principles, policies and practices as were used in preparing the balance sheet of Seller contained within the financial statements of Seller as the same were made available to Purchaser and (b) a statement setting forth in reasonable detail the Closing Date Estimated Current Assets Amount and the Closing Date Current Assets Adjustment Amount, if any, in each case as determined from such balance sheet of Seller.

"Excluded Assets" has the meaning set forth in Section 1.2.

"Final Adjustment Amount" has the meaning set forth in Section 2.5(e).

"Final Order" means an action taken or order issued by the applicable Governmental Authority as to which: (i) no request for stay of the action or order is pending, no such stay is in effect, and

if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or order is pending, and if any deadline for filing such rehearing or reconsideration is designated by statute or regulation, it is passed, including any extensions thereof; (iii) the Governmental Authority does not have the action or order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Final Current Assets Adjustment Amount" means the amount (positive or negative) by which the Final Current Assets Amount exceeds or is less than the Closing Date Estimated Current Assets Amount.

"Final Current Assets Amount" means the aggregate amount of the Current Asset Components as of March 9, 2016, as shown on the Final Working Capital Adjustment Worksheet.

"Final Working Capital Adjustment Worksheet" means (a) the Working Capital Spreadsheet of Seller as of 12:01 on the Closing Date prepared in accordance with the same accounting principles, policies and practices as were used in preparing the Estimated Working Capital Spreadsheet and (b) a statement setting forth in reasonable detail the Final Current Assets Amount and the Final Current Assets Adjustment Amount, if any, in each case as determined in accordance with Exhibit 2.4 and this Agreement.

"Goich Insider Avoidance Claims" means the claims of Seller arising under Chapter 5 of the Bankruptcy Code against Michael Goich, Marija Goich, Goich Family Real Estate LLC, JM Industries, MZG Associates LLC, MZG Associates II LLC, Peterson Manufacturing, Standard Boiler, and any family member of Michael Goich (the "**Goich Insiders**"), or any other entity owned, in whole or in part, by a Goich Insider.

"Governing Documents" means the agreements and instruments by which any Person (other than an individual) establishes its legal existence and/or governs its internal affairs.  For example, (i) the Governing Documents of a corporation include its certificate or articles of incorporation (or other instrument of formation) and all amendments thereto, its by-laws (or equivalent) and all amendments thereto, its minute books and copies of all resolutions, written consents and other corporate actions of its shareholders and directors, its equity ledgers and all other stock records, (ii) the Governing Documents of a limited partnership include its certificate of limited partnership (or other instrument of formation) and all amendments thereto, its limited partnership agreement and all amendments thereto, any resolutions, written consents and other formal actions of its partners and its equity ledgers and other partnership interest records, and (iii) the Governing Documents of a limited liability company include its certificate of formation (or other instrument of formation) and all amendments thereto, its limited liability company agreement or operating agreement and all amendments thereto, any resolutions, written consents and other formal actions of its members and managers and its equity ledgers and other limited liability company interest records.

"Governmental Authority" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to the United States or to a foreign federal, state or local government, any governmental authority, agency, department, board, commission or instrumentality or any political subdivision thereof, and any tribunal or court or arbitrator(s) of competent jurisdiction, and shall include the Bankruptcy Court.

"Harvey Leases" shall mean the Net Lease between MZG Associates, LLC and LB Steel, LLC, dated January 1, 2003, as amended by Lease Amendment, dated December 15, 2009, and Net Lease dated November 28, 2012, for a lease of the real property situated in 15700 Lathrop Avenue, Harvey, Illinois 60426 and the Net Lease between Goich Real Estate Partners and LB Steel, LLC, dated November 28, 2012, for a lease of the real property situated in 296 East 156th St., Harvey, Illinois 60426.

"Indebtedness" of any Person means, without duplication: (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business); (iii) all obligations of such Person under Capital Leases; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations, "keep well" agreements, agreements to maintain or contribute cash or capital to any Person or other similar agreements or arrangements; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Intellectual Property" means each of Seller's intellectual property and proprietary rights related to the Business existing immediately prior to, and to be assigned to Purchaser at, the Closing, of any type arising from or in respect of the following in any jurisdiction throughout the world: all (i) inventions, discoveries, industrial designs, business methods, patents and patent applications (including provisional and Patent Cooperation Treaty applications), including continuations, divisionals, continuations-in-part, reexaminations and reissues, extensions, renewals and any patents that may be issued with respect to the foregoing; (ii) trademarks, service marks, design marks, certification marks, collective marks, trade names, business names, assumed names, d/b/a's, fictitious names, brand names, trade dress, logos, symbols, other indicia of source of origin, phone numbers, toll free phone numbers, internet domain names and corporate names, and general intangibles of a like nature and other indicia of origin or quality, whether registered, unregistered or arising by Law, and all applications, registrations, and renewals for any of the foregoing, together with the goodwill associated with and symbolized by each of the foregoing; (iii) published and unpublished works of authorship in any medium, whether copyrightable or not (including databases and other compilations of information, computer software, source code, object code, algorithms, and other similar materials and Internet website content), copyrights and moral rights therein and thereto, and registrations and applications therefore, and all issuances,

renewals, extensions, restorations and reversions thereof; (iv) Trade Secrets; (v) Intellectual Property Licenses; and (vi) all other intellectual property, together with all rights to collect income and royalties and to recover damages or lost profits in connection therewith and all rights to sue and recover and other rights and remedies related thereto for past, present or future infringement, dilution, misappropriation or other violation relating to any of the foregoing.

"Intellectual Property Licenses" means (i) any Contract that contains any grant by Seller to any third Person of any license, sublicense, right, permission or consent to use, publish, perform, exploit, or covenant not to sue, with respect to any of the Intellectual Property, and (ii) any Contract that contains any grant by any third Person to Seller of any license, sublicense, right, permission or consent to use, publish, perform, exploit, or covenant not to sue, with respect to any Intellectual Property of such third Person.

"Inventory" means all inventory of any kind or nature, whether or not prepaid, and wherever located, held or owned by Seller, including (i) inventory that is in the production process and has not yet been completed (or "work-in- process"), (ii) inventory that has completed the production process (or "finished goods"), and (iii) raw materials.

"Inventory - Plate" means all Inventory of the following items set forth below.  Terms used in this definition have the meanings customarily ascribed to such terms by Seller in the conduct of its Business:

- Prime - steel plate with a Mill Test Report, chemistry and grade

- Billet - Secondary steel billet no grade no chemistry

- Strip Mill Plate - Secondary steel cobble from a strip mill

- Roll to Gauge - Secondary steel plate rolled to gauge on a strip mill

- Stock Plate - Secondary steel plate

- Irregular Sized ("Drops") - Any of the above items where the dimensions of the plate are either less than 47 inches wide or 96 inches long.

"Inventory - Non-Plate" means all Inventory other than Inventory - Plate, including, without limitation, finished goods in transit, purchased parts (meaning parts that have been purchased specifically for customer's fabricated item, e.g., batteries, wiring harnesses, light housings, etc.), and shall include the work in process product being manufactured for Scot Forge for which JM Industries is providing fabrication services to the extent the Seller has incurred expenses for such manufacture during the administrative period.

"IRS" means the United States Internal Revenue Service.

"Knowledge" (and derivations thereof) means the actual knowledge (after reasonable investigation) of Michael Goich when used with respect to Seller; and David Muslin when used with respect to Purchaser.

"Law" means any foreign, federal, state or local law (including common law), statute, code, ordinance, rule, regulation, Final Order or other requirement enacted, promulgated, issued or entered by a Governmental Authority.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, arbitration, claim, inquiry, proceedings (public or private) or investigation by or before a Governmental Authority of any nature, civil, criminal, regulatory or otherwise, in law or in equity.

"Liabilities" means any and all debts, losses, liabilities, claims (including claims as defined in the Bankruptcy Code), damages, fees, expenses, fines, costs, royalties, proceedings, deficiencies or obligations (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims, and any out-of-pocket costs and expenses in connection therewith (including legal counsels', accountants', or other fees and expenses incurred in defending any action or in investigating any of the same or in asserting any rights thereunder or hereunder).

"Licenses" means any approvals, authorizations, consents, licenses, permits or certificates.

"Lien" means any lien, license, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, right of first offer, hypothecation, assignment, deposit, arrangement, easement, servitude, transfer restriction under any shareholder or similar agreement or encumbrance or any other preference, priority or other security agreement or preferential arrangement, restriction or limitation of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, and financing statement perfecting a security interest under the Uniform Commercial Code as in effect from time to time in the State of Illinois or comparable law of any jurisdiction), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non contingent, material or non material, known or unknown.

"Litigation Claims" means all of Seller's actions, rights, claims and causes of action of any kind or nature in connection with, resulting from or arising under: (1) Chapter 5 of the Bankruptcy Code; (2) the Walsh Litigation including, without limitation, the following in connection therewith: (a) adversary proceedings, (b) the funds held by the Clerk of the Circuit Court of Cook County Illinois, (c) appeals of and rights to appeal Orders, and (d) insurance proceeds owed to Seller by St. Paul Guardian Insurance Company or any other insurance carrier; and (3) any claim which Seller could assert against its current or former employees, officers, directors, managers or owners.

"Material Adverse Effect" means any change, circumstance, fact, condition or event that, individually or in the aggregate with any other change, circumstance, fact, condition or event, (a) has or could reasonably be expected to have a materially adverse effect on (i) the Business, financial condition, results of operations, properties or assets of Seller (taken as a whole) as the same shall have existed as of the date hereof, or (ii) the ability of Seller or Purchaser to

materially perform their respective obligations under this Agreement, or (b) prevents or materially delays the consummation of the Transactions, in each case other than adverse change, circumstance, fact, condition or event resulting from one or more of the following: (i) the condition of the economy or the securities markets in general, or any outbreak of hostilities, terrorist activities or war involving the United States of America; (ii) the announcements, pendency or consummation of the sale of the Purchased Assets, provided that the result thereof would not reasonably be expected to prevent the Business from operating substantially in the ordinary course of business; (iii) any changes in applicable Laws or accounting rules; or (iv) any material breach by the breaching Party of any covenant or agreement herein or any representation or warranty of the breaching Party having been or having become untrue in any material respect as of the date hereof which shall not be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect for the non-breaching Party.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

"Permitted Liens" means:

> (a)     with respect to any real property and to the extent that they do not materially interfere with the ownership, occupancy, use or operation of the affected Leased Property in the manner and for the purposes heretofore used by Seller in connection with the Business, any easements, restrictive covenants, and rights-of- way on, over or in respect of any Leased Property;

> (b)     all rights reserved to or vested in any Governmental Authority to control or regulate the Purchased Assets and all obligations and duties under all applicable Laws or under any permit issued by any Governmental Authority;

> (c)     statutory Liens for current and future Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith;

> (d)     statutory Liens arising in the ordinary course of business that are not overdue and that do not materially affect the value or use of the affected assets;

> (e)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

> (f)     any Lien that pursuant to section 363(f) or sections 1123 and 1129 of the Bankruptcy Code will be released from the Purchased Assets upon entry of the Sale Order; and

> (g)     other Liens that will be released on or prior to Closing at no cost or expense to Purchaser.

"Person" means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies,

trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and all Governmental Authorities.

"Petition Date" has the meaning set forth in the Recitals.

"Pre-Closing Tax Period" means any Tax period (or the portion thereof) ending on or before the Closing Date (including the portion of any Straddle Period ending on the Closing Date).

"Purchaser Assumed Contract" means, to the extent assignable pursuant to section 365 of the Bankruptcy Code, each Contract set forth on Schedule 1.1(b) and corresponding Contract Rights thereunder (as may be modified prior to the Closing pursuant to Section 1.5) to be assigned to Purchaser under section 365 of the Bankruptcy Code.

"Representatives" of a Person means its officers, directors, managers, employees, attorneys, investment bankers, accountants, trustees and other agents and representatives.

"Sale Hearing" has the meaning given to such term in the Bidding Procedures Order.

"Sale Order" means a Final Order of the Bankruptcy Court issued pursuant to sections 105, 363, 365, 1123 and/or 1129 (as applicable) of the Bankruptcy Code agreed upon by Purchaser and Seller, which Final Order approves the sale to Purchaser under this Agreement and all of the terms and conditions hereof, and approves and authorizes Seller to consummate the Transactions and enter into the Transaction Documents with such modifications as are satisfactory to Seller and Purchaser.  Without limiting the generality of the foregoing, such Final Order shall specifically include, among other things, provisions ordering that in the event that the Bankruptcy Case is converted to a case under chapter 7 of the Bankruptcy Code, the Sale Order shall be binding on the chapter 7 trustee in such chapter 7 case.

"Secured Lender" means MB Financial Bank, N.A.

"Straddle Period" means any Tax period beginning on or before, and ending after, the Closing Date.

"Subsidiary" or "subsidiary" means, with respect to any Person, any corporation, limited liability company, joint venture or partnership of which such Person (a) beneficially owns, either directly or indirectly, at least fifty percent (50%) of (i) the total combined voting power of all classes of voting securities of such entity entitled, under ordinary circumstances, to vote in the election of directors or other governing body of such Person, (ii) the total combined equity interests, or (iii) the capital or profit interests, in the case of a partnership; or (b) otherwise has the power to vote or to direct the voting of sufficient equity interests to elect a majority of the board of directors or similar governing body of such Person.

"Tangible Personal Property" has the meaning set forth in Section 1.1(d).

"Tax" means all federal, state, provincial, territorial, municipal, local or foreign income, profits, gross receipts, environmental (including taxes under Code Section 59A), customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, employment, escheat, abandon or unclaimed property, social security, disability, occupation, pension, real

property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts and other similar charges and assessments of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed by or on behalf of any Governmental Authority, and including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"Tax Returns" means any report, return, declaration, claim for refund, information report or return or statement required to be supplied to a Taxing Authority in connection with Taxes, including any schedule or attachment thereto or amendment thereof.

"Taxing Authority" means any Governmental Authority exercising any authority to impose, regulate, levy, assess or administer the imposition of any Tax.

"Trade Secrets" means confidential and proprietary information, trade secrets, and know-how, including methods, processes, business plans, recipes, schematics, concepts, software and databases (including data source code, object code and algorithms), formulae, drawings, prototypes, models, designs, devices, technology, research and development and customer information and lists.

"Transaction Documents" means this Agreement, the bill of sale, the Assignment and Assumption Agreement, the assignment and assumption agreements with respect to each Real Property Lease, and all other Contracts and agreements necessary to effectuate the Transactions.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents.

"Transfer Taxes" has the meaning set forth in Section 8.4.

"Transferred Employees" has the meaning set forth in Section 8.1.

"Walsh Litigation" shall mean the cases described in paragraphs 10, 11 and 12 in the Declaration of Michael Goich in Support of Debtor's Chapter 11 Petitions and First Motions filed with the Bankruptcy Court on October 19, 2015.

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (1988) and any similar state or local "mass layoff" or "plant closing" laws.

"Warren Property" has the meaning set forth in Section 1.1(g)

"Warren Business" means the business conducted at and relating to the Warren Facility.

"Warren Facility" means the manufacturing and administrative facility, including but not limited to the real estate located at 1451 Buena Vista N.E., Warren, OH 44482.