# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| LB STEEL, LLC, | Case No. 15-35358 |
| Debtor. | Honorable Janet S. Baer |

## DISCLOSURE STATEMENT WITH RESPECT
## TO JOINT PLAN OF LIQUIDATION OF LB STEEL, LLC

Daniel A. Zazove (ARDC No. 3104117)
David J. Gold (ARDC No. 6299872)
**PERKINS COIE LLP**
131 S. Dearborn St., Ste. 1700
Chicago, Illinois 60603
Telephone: (312) 324-8400
dzazove@perkinscoie.com
dgold@perkinscoie.com

*Counsel to the Debtor*

Rosanne Ciambrone (ARDC No. 6199456)
Richard P. Darke (ARDC No. 6255810)
**DUANE MORRIS LLP**
190 S. LaSalle St., Ste. 3700
Chicago, Illinois 60603
Telephone: (312) 499-6700
rciambrone@duanemorris.com
rpdarke@duanemorris.com

*Counsel to the Official Committee of
Unsecured Creditors of LB Steel, LLC*

Dated: June 24, 2019

## TABLE OF CONTENTS

I.      INTRODUCTION AND DISCLAIMERS .................................................................... 1

II.     SUMMARY OF THE PLAN ...................................................................................... 2

III.    VOTING AND CONFIRMATION PROCEDURES ........................................................ 4

Under the terms of the Plan, the Holders of Claims in Class 1 (General Unsecured Claims) and
Class 2 (Walsh Claim) are impaired and are thus entitled to vote to accept or reject the Plan. ..... 4

        A.      Voting Procedures................................................................................................ 4

        B.      Joint Hearing on Sufficiency of Disclosure Statement and Plan Confirmation...... 4

IV.     OVERVIEW OF THE DEBTOR'S OPERATIONS .......................................................... 5

        A.      Description and History of the Debtors' Businesses ............................................. 5

        B.      Prepetition Capital Structure and Financial Position ............................................. 6

        C.      Events Leading to Chapter 11 Filing ..................................................................... 6

        D.      Chapter 11 Case .................................................................................................... 7

        E.      Chapter 11 Sale .................................................................................................... 7

        F.      Walsh Settlement .................................................................................................. 7

        G.      Adversary Proceedings ......................................................................................... 8

V.      OVERVIEW OF THE PLAN ...................................................................................... 10

        A.      General Information Concerning Treatment of Claims and Interests................... 10

        B.      Summary of Distributions.................................................................................... 10

        C.      Assets and Liabilities ........................................................................................... 11

        (i)     **Assets**................................................................................................................. 11
        (ii)    **Liabilities** .......................................................................................................... 11
        D.      Implementation and Distribution ......................................................................... 11

        (i)     **Prosecution of the Litigation Actions**............................................................... 11
        (ii)    **Distribution of Net Proceeds**........................................................................... 12
        (iii)   **Rights of the Debtor** ........................................................................................ 12
        (iv)    **Management of the Debtor** ............................................................................... 13
        (v)     **Occurrence of the Effective Date** ...................................................................... 13

(vi)     **Termination of the Committee** ................................................................. 13

(vii)    **United States Trustee Fees** .................................................................. 13

(viii)   **Semi-Annual Reports** ......................................................................... 13

(ix)     **Wind-Down and Case Closure** ............................................................ 13

E.       Status of Executory Contracts and Administrative and Disputed Claims ........... 14

(i)      **Executory Contracts** .......................................................................... 14

(ii)     **Administrative Claims** ......................................................................... 14

(iii)    **Disputed Claims** ................................................................................ 14

VI.      CONFIRMATION AND CONSUMMATION PROCEDURE ...................................... 14

A.       Solicitation of Votes ............................................................................... 14

B.       The Joint Hearing................................................................................... 15

C.       Confirmation ......................................................................................... 15

(i)      **Unfair Discrimination and Fair and Equitable Tests**................................. 15

(ii)     **Best Interests Test and Liquidation Analysis**....................................... 16

VII.     TAX CONSEQUENCES............................................................................... 16

A.       General................................................................................................. 17

B.       Federal Income Tax Consequences to the Debtors............................... 17

Under the Plan, the Debtor's outstanding indebtedness will be satisfied in exchange for cash. The satisfaction of a debt obligation for an amount of cash and other property having a fair market value less than the debt obligation generally gives rise to cancellation of indebtedness ("*COD*") income to a debtor. However, with the exception noted below, the Debtor will not recognize COD income because the debt discharge occurs in a bankruptcy case. The Debtor will instead, to the extent available, reduce its tax attributes to the extent of its COD income in the following order: (i) net operating losses; (ii) general business credit carryforwards; (iii) minimum tax credit carryforwards; (iv) capital loss carryforwards; and (v) the tax basis of the Debtor's depreciable and nondepreciable assets (but not below the amount of its liabilities immediately after the discharge). .............................................. 17

The Debtor may elect to alter the preceding order of attribute reduction and, instead, first reduce the tax basis of its depreciable assets. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (i.e., such attributes may be available to offset taxable income that accrues between the date of discharge and the end of the Debtor's tax year). The Debtor does not recognize any COD income that exceeds the amount of available tax attributes, and such excess COD income has no other U.S. federal income tax effect............................................................................... 18

As a result of the above, the Debtor does not expect to incur any substantial tax liability as a result of implementation of the Plan................................................................... 18

C.       Federal Income Tax Consequences to Holders of Allowed Claims .................... 18

In general, a Holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the Holder's tax basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the Holder, the length of time the Holder held the Claim, and whether the Claim was acquired at a market discount. If the Holder realizes a capital loss, the Holder's deduction of the loss may be subject to limitation. The Holder's tax basis for any property received under the Plan generally will equal the amount realized. The Holder's amount realized generally will equal the sum of the cash and the fair market value of any other property received by the Holder under the Plan on the Effective Date or a subsequent distribution date, less the amount (if any) treated as interest, as discussed below. ....................................................... 18

Because certain Holders of Allowed Claims may receive cash distributions after the Effective Date, the imputed interest provisions of the Tax Code may apply and cause a portion of the subsequent distributions to be treated as interest. Additionally, because Holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the Holder may be deferred. All Holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims. .......................................... 18

Holders of Allowed Claims will recognize ordinary income to the extent that they receive cash under the Plan. If an Allowed Claim includes interest, and if the Holder receives less than the amount of the Allowed Claim pursuant to the Plan, the Holder must allocate the Plan consideration between principal and interest. Holders of Allowed Claims are strongly urged to consult their own tax advisors in this regard. If the Plan consideration allocable to interest with respect to an Allowed Claim is less than the amount that the Holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally at a loss. ............................................................................................. 18

A Holder who receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the Tax Code or a worthless securities deduction under section 165(g) of the Tax Code. The rules governing the character, timing, and amount of bad debt and worthless securities deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction. .................................................................................................................. 19

D.    Income Reporting and Withholding ........................................................... 19

E.    Federal Income Tax Consequences to Holders of Interests ................................. 19

F.    Importance of Obtaining Professional Tax Assistance .......................................... 19

VIII.    RISK FACTORS ..................................................................................... 20

A.    Failure To Satisfy Vote Requirement ........................................................ 20

B.    Non-Consensual Confirmation ............................................................. 20

C.    Amount of Allowed Claims .................................................................. 20

IX.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION............................ 20

        A.     Chapter 7 Liquidation of the Debtor ...................................................................... 20

X.      CONCLUSION.................................................................................................................. 21

## I.    INTRODUCTION AND DISCLAIMERS

The Debtor, LB Steel, LLC, and the Official Committee of Unsecured Creditors (the "*Committee*"), submit this disclosure statement to solicit acceptances of the Joint Plan of Liquidation distributed contemporaneously.[1]

THIS DISCLOSURE STATEMENT IS SENT TO CREDITORS TO PROVIDE ADEQUATE INFORMATION WHEN VOTING ON THE PLAN.  CREDITORS ARE URGED TO CONSULT WITH THEIR ADVISORS AND TO REVIEW THIS DISCLOSURE STATEMENT AND THE PLAN BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  DISCLOSURES MADE AS TO THE LITIGATION ACTIONS SHOULD NOT BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY.  IN NO INSTANCE SHOULD THIS DISCLOSURE STATEMENT BE CONSTRUED AS ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN.

The Disclosure Statement describes the key aspects of the Plan, this Case, and the prosecution of certain Litigation Actions, including the means by which the Debtor intends to: (i) prosecute the Litigation Actions; (ii) preserve claims or Causes of Action; (iii) analyze and reconcile Claims; and (iv) distribute funds to Holders of Allowed Claims.  Summaries of agreements referred to in this Disclosure Statement may not be complete and are subject to the full text of such agreements.

**THE DEBTOR AND THE COMMITTEE BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF ALL PARTIES, INCLUDING THE DEBTOR, ITS CREDITORS, AND ITS ESTATE, AND URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.  DETAILED VOTING INSTRUCTIONS ARE SET FORTH IN SECTION III.A.**

**TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED BY RACHEL LEIBOWITZ, PERKINS COIE LLP, 131 SOUTH DEARBORN STREET, SUITE 1700, CHICAGO, ILLINOIS 60603 BY NO LATER THAN 5:00 P.M. (CENTRAL DAYLIGHT TIME) ON SEPTEMBER 9, 2019.**

**A HEARING TO CONSIDER THE ADEQUACY OF THIS DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN WILL BE HELD BEFORE UNITED STATES BANKRUPTCY JUDGE JANET BAER IN COURTROOM 615, 219 SOUTH DEARBORN ST. CHICAGO, IL 60604, ON SEPTEMBER 19, 2019 AT 9:30 A.M. (CENTRAL DAYLIGHT TIME), OR AS SOON THEREAFTER AS COUNSEL MAY BE HEARD.  THE BANKRUPTCY COURT HAS DIRECTED THAT ANY OBJECTION TO THE ADEQUACY OF THE DISCLOSURE STATEMENT OR TO CONFIRMATION OF THE PLAN BE FILED AND SERVED ON OR BEFORE SEPTEMBER 9, 2019 AT 5:00 P.M. (CENTRAL DAYLIGHT TIME).**

Any Creditor having questions regarding the Plan or the Disclosure Statement may contact counsel for the Debtor and/or the Committee:

---

[1]    Unless otherwise defined, all capitalized terms shall have the meanings ascribed to them in the Plan.

- 1 -

Daniel A. Zazove (ARDC No. 3104117)
David J. Gold (ARDC No. 6299872)
**PERKINS COIE LLP**
131 S. Dearborn St., Ste. 1700
Chicago, Illinois 60603
Telephone: (312) 324-8400
dzazove@perkinscoie.com
dgold@perkinscoie.com

*Counsel to the Debtor*

Rosanne Ciambrone (ARDC No. 6199456)
Richard P. Darke (ARDC No. 6255810)
**DUANE MORRIS LLP**
190 N. LaSalle St., Ste. 3700
Chicago, Illinois 60603
Telephone: (312) 499-6700
rciambrone@duanemorris.com
rpdarke@duanemorris.com

*Counsel to the Official Committee of
Unsecured Creditors of LB Steel, LLC*

## II.   SUMMARY OF THE PLAN

| **General Overview of the Plan** | |
|---|---|
| **Plan** | Joint Plan of Liquidation of LB Steel, LLC |
| **Plan Proponents** | The Debtor and the Committee.  The Committee consists of the following holders of General Unsecured Claims: (i) Janco Steel Ltd; (ii) Welding Industrial Supply Co.; (iii) SSAB Americas; (iv) The Walsh Group; and (v) EVRAZ North America. |
| **General Purpose** | The Plan contemplates the prosecution of Litigation Actions for the benefit of Holders of Allowed Claims.  The Holders of Allowed Class 1 Claims and the Allowed Class 2 Claim will share in the proceeds from the Litigation Actions as provided in the Plan. |
| **Summary of Claims** | |
| **Priority Claims** (*Unclassified*) | Priority Claims consist of Allowed Tax Claims, Allowed Administrative Claims such as wages, benefits and taxes, and Allowed Professional Fee Claims for attorneys and financial advisors retained by the Debtor or the Committee. |
| | The Holders of Allowed Administrative Claims, Allowed Professional Fee Claims, and Allowed Tax Claims will be paid in full by the Debtor in accordance with the Plan. |
| | Allowed Administrative Claims and Allowed Tax Claims are estimated as totaling $13,163.  Allowed Professional Fee Claims are difficult to estimate at this time due to the fact that: (1) the remaining Professional Fee Claims will largely consist of the legal expenses to prosecute the Litigation Actions and (2) the defendants in the Litigation Actions have vigorously defended, and continue to actively defend, those actions. |

- 2 -

| | |
|---|---|
| **Class 1 Claims** | Class 1 consists of all Allowed General Unsecured Claims except the Class 2 Claim.  Class 1 Claims are impaired under the Plan and no interest will accrue on them.<br><br>The Holders of Class 1 Claims will receive their Pro Rata share of Net Proceeds from the Litigation Actions.<br><br>The total anticipated recovery from the Litigation Actions is estimated as approximately $3,000,000.<br><br>The Class 1 Claims total approximately $16,000,000. |
| **Class 2 Claim** | The Class 2 Claim consists of the Allowed Walsh Claim.  The Class 2 Claim is impaired by the Plan, and no interest will accrue on the Class 2 Claim.<br><br>Walsh Construction Company ("*Walsh*"), the Holder of the Class 2 Claim, will receive its Pro Rata share of Net Proceeds from the Litigation Actions after the Distribution Event.  Following the Distribution Event, the General Unsecured Claims and the Walsh Claim shall be treated as a single class for determining each Class 1 and Class 2 Claims' Pro Rata share of Net Proceeds from the Litigation Actions.<br><br>The total anticipated recovery on the Walsh Claim is uncertain.<br><br>The Allowed Walsh Claim is $24,132,650. |
| **Class 3 Interests** | Class 3 consists of the Interests in the Debtor.  Class 3 Interests are impaired by the Plan.<br><br>Holders of Class 3 Interests will receive no distribution under the Plan, and all Class 3 Interests will be cancelled and rendered void on the Effective Date. |
| | **Implementation of Plan** |
| **Funding** | The Plan will be funded by the continued prosecution of the Litigation Actions and the Debtor's cash on hand.  The total recovery from the Litigation Actions is estimated to be approximately $3,000,000.<br><br>The Debtor may make, but shall not be required to make, an interim or final distribution on Class 1 or Class 2 Claims pending entry of a Final Order (as such term is defined in the Plan) in all of the Litigation Actions. |

| Committee | The Committee shall remain in existence until a Final Order has been entered closing the Debtor's Case. |
|---|---|
| Effective Date | The Effective Date shall occur upon the entry of the Confirmation Order by the Bankruptcy Court. |

## III.   VOTING AND CONFIRMATION PROCEDURES

Under the terms of the Plan, the Holders of Claims in Class 1 (General Unsecured Claims) and Class 2 (Walsh Claim) are impaired and are thus entitled to vote to accept or reject the Plan.

Votes on the Plan are not being solicited from Holders of Interests in Class 3 (Interests of Equity Security Holders).  Class 3 Interests will receive no distribution under the Plan and are thus deemed to have rejected the Plan and are not entitled to vote.

### A.   Voting Procedures

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for the purpose of voting on the Plan.  Please carefully follow the instructions set forth in the ballot and vote and return your ballot(s) to:

IF BY FIRST CLASS MAIL, HAND DELIVERY OR OVERNIGHT COURIER:
Rachel Leibowitz
Perkins Coie LLP
131 South Dearborn Street, Suite 1700
Chicago, Illinois 60603

**TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN 5:00 P.M. (CENTRAL DAYLIGHT TIME) ON SEPTEMBER 9, 2019 (THE "*VOTING DEADLINE*").**

**ANY BALLOT WHICH IS EXECUTED BUT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR WHICH BOTH THE ACCEPTANCE AND REJECTION BOX IS CHECKED, WILL BE DEEMED TO BE AN ACCEPTANCE OF THE PLAN.  ANY BALLOT THAT IS EITHER UNRETURNED BY THE VOTING DEADLINE, OR THAT IS RETURNED BUT NOT EXECUTED, WILL BE CONSIDERED NULL AND VOID AND WILL NOT BE COUNTED.**

If you are a holder of a Claim entitled to vote on the Plan and did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting on the Plan, please call counsel for the Debtor, Perkins Coie LLP, Attention:  Daniel A. Zazove, Esq., 312-324-8400 or Jeri Miller, Esq., 214-965-7702, or counsel for the Committee, Duane Morris LLP, Attention:  Rosanne Ciambrone, Esq., 312-499-6700 or Richard P. Darke, Esq., 312-499-6701.

### B.   Joint Hearing on Sufficiency of Disclosure Statement and Plan Confirmation

- 4 -

The Bankruptcy Court is required to hold a hearing upon notice to determine whether the Disclosure Statement meets the adequacy and confirmation requirements of the Bankruptcy Code. Any party-in-interest may object to the adequacy of the Disclosure Statement or confirmation of the Plan. The Bankruptcy Court has scheduled a joint hearing with respect to the sufficiency of this Disclosure Statement and confirmation of the Plan for September 19, 2019, at 9:30 a.m. (Central Daylight Time) (the "*Joint Hearing*"). Notice of the Joint Hearing has been, or will be, provided to all holders of Claims and Interests and other parties-in-interest (the "*Confirmation Notice*").

Objections, if any, to the adequacy of the Disclosure Statement or confirmation of the Plan must: (i) be in writing; (ii) state the name and address of the objecting party and the nature of the Claim or Interest of such party; (iii) state with particularity the basis and nature of any objection; and (iv) be filed, together with proof of service, with the Bankruptcy Court and served on the following parties so that the objection is received no later than 5:00 p.m. (Central Daylight Time) on September 9, 2019 (the "*Objection Deadline*") by: (a) counsel to the Debtor, Perkins Coie LLP, 131 S. Dearborn Street, Suite 1700, Chicago, Illinois 60603 (Attn: Daniel A. Zazove, Esq.); (b) counsel to the Committee, Duane Morris LLP, 190 South LaSalle Street, Suite 3700, Chicago, Illinois 60603 (Attn: Rosanne Ciambrone, Esq.); and (c) Office of the United States Trustee, 219 S. Dearborn Street, Room 873, Chicago, Illinois 60604 (Attn: Patrick S. Layng, Esq.).

## IV.    OVERVIEW OF THE DEBTOR'S OPERATIONS

### A.    Description and History of the Debtors' Businesses

Founded in 2001, the Debtor was a distributor of non-prime steel plate and steel parts for construction, agricultural, mining equipment, and power generation industries. The Debtor offered outsourced machining, fabricating, burning, and assembly services to its customers located throughout North America. The Debtor's services included the following:

(i)    Plate: Certified chemistry plate products in various shapes and sizes to accommodate part nesting requirements.

(ii)    Outsourced manufacturing: Manufacturing of parts and products according to customer's product specifications and demand. Related services include plate leveling, painting, oxy-fuel burning, and plasma/laser cutting.

(iii)    Fabrication and Welding: Processing metals into usable product such as the structural supports of buildings and other products.

(iv)    Counterweights: Producing counterweights used in the operation of equipment to hoist heavy loads, such as elevators and cranes.

(v)    Assembly: Electrical, hydraulic pneumatic, and mechanical assembly services.

The Debtor was headquartered in Harvey, Illinois, where it employed 232 people. In addition, the Debtor employed 80 people in Topeka, Kansas and Warren, Ohio. The Debtor's workforce consisted of approximately 241 union employees and 71 non-union employees, with the unionized employees subject to collective bargaining agreements with Shopmen's Local Union

- 5 -

#473 of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, Sheet Metal Air, Rail, & Transportation Workers Union Local #2, and United Steel Workers.

### B.    Prepetition Capital Structure and Financial Position

At the time of filing, the Debtor was indebted to MB Financial, N.A. pursuant to a $15,000,000 line of credit expiring June 2016 and a $2,400,000 term loan expiring June 2018. The Debtor's obligations to MB Financial were collateralized by substantially all of its assets. In addition, the Debtor was indebted to LB Industries, Inc. and to Michael and Mara Goich pursuant to two promissory notes for $3,550,000 and $400,000 respectively. Both promissory notes were subordinated to the loans of MB Financial pursuant to a written subordination agreement dated June 18, 2014.

### C.    Events Leading to Chapter 11 Filing

The Debtor's business experienced a multi-year downturn following a decline in the mining and extraction, oil and gas, and other heavy industries in which the Debtor's customers operate, in addition to a drop in the commodity prices for steel. As a result, revenues declined significantly, and the Debtor began to operate at a loss. Adding to the pressures, the Debtor experienced a number of financial difficulties, including a loss of major customers due to increased competition from foreign producers, the continued purchase of steel for resale in a severely declining market, and poor quality control that led to increased cost for the delivery of a conforming customer product.

Compounding the above issues, the Debtor found itself in protracted litigation concerning a 2003 construction contract with Walsh. In January 2003, the City of Chicago and Walsh entered into a contract for the construction of a canopy and curtain wall at the O'Hare International Airport. Walsh entered into a subcontract with Carlo Steel Corporation, who in turn subcontracted with the Debtor for the fabrication and shop welding of the steel supports for the canopies.

In December 2004, the City of Chicago identified defects in the canopy and curtain wall, and a series of lawsuits by and against the Debtor followed (the "*Walsh Litigation*"). On August 24, 2015, a bench trial commenced before the Honorable John C. Griffin in the Circuit Court of Cook County. On October 14, 2015, the Circuit Court issued a judgment in favor of Walsh and against the Debtor in the amount of $27,500,000 for breach of contract. The Circuit Court also found that the Debtor was entitled to a credit for $8,312,696 based on its contract, bond, and lien claims, resulting in a net judgment in favor of Walsh against the Debtor in the amount of $19,187,304. On an appeal taken after the Debtor filed for bankruptcy, the Illinois Appellate Court largely upheld the Circuit Court's ruling.

The Debtor's poor financials, coupled with the reasonable likelihood of a significant judgment against the Debtor in the Walsh Litigation, led the Debtor to investigate filing for bankruptcy. The Debtor filed for bankruptcy after the Circuit Court entered judgment against the Debtor, Walsh evidenced an intent to lien and freeze the Debtor's bank accounts and MB Financial notified the Debtor that it would sweep all deposits in its account. Upon the filing, all actions against the Debtor or its property were stayed.

- 6 -

### D.    Chapter 11 Case

On October 29, 2015, the United States Trustee held a meeting of unsecured creditors for the purpose of forming a Committee. A Committee was appointed on October 29, 2015 [*Docket No. 69*] and counsel for the Committee was approved shortly thereafter [*Docket No. 123*]. The Committee consists of Janco Steel Ltd., Welding Industrial Supply Co., SSAB Americas, The Walsh Group, and EVRAZ North America.

Since its formation, the Committee has taken an active role in the Debtor's case. Consistent with its duties under section 1103 of the Bankruptcy Code, the Committee: (i) consulted with the Debtor on the administration of the Case; (ii) investigated the acts, conduct, assets, liabilities and financial condition of the Debtor, the operation of its businesses and matters relevant to the Case; (iii) undertook considerable efforts to ensure a vibrant and successful auction of the Debtor's assets; and (iv) took a key role in the negotiation, drafting and formulation of the Plan and this Disclosure Statement.

### E.    Chapter 11 Sale

On November 2, 2015, the Debtor moved for authority to sell substantially all of its assets free and clear of the interests of all parties, including the security interest of its lender, pursuant to section 363 of the Bankruptcy Code [*Docket No. 75*]. On November 16, 2015, the Bankruptcy Court granted the motion [*Docket No. 107*].

The Debtor engaged in a robust sale process, retaining Livingstone Partners LLC ("*Livingstone*") as its investment bankers to aggressively market its assets. However, overall poor conditions in the steel industry left many potential buyers sitting on the sidelines. Nevertheless, Livingstone did identify and qualify several buyers, and a competitive auction was held on February 22, 2016, at which the initial sale price of $10,900,000 was bid up to $11,850,000 (not including a working capital adjustment) by LB Metals, LLC ("*LB Metals*"). The Committee and Walsh opposed the sale to LB Metals on the basis that nearly all the sale proceeds would be used to pay off the Debtor's $11,000,000 secured loan with MB Financial. After a contested, two-day, evidentiary hearing, the Bankruptcy Court approved the sale to LB Metals over all objections, and the sale closed on March 11, 2016 [*Docket No. 226*].

Pursuant to the closed sale, the Debtor used nearly all the proceeds from the sale to satisfy the claim of its secured lender, MB Financial. Additionally, several real and personal property leases, as well as other executory contracts and all employee obligations, were cured and/or assigned pursuant to the approved asset purchase agreement.

### F.    Walsh Settlement

The Debtor made numerous, unsuccessful attempts to settle the Walsh litigation both pre and post-bankruptcy filing. While settlement attempts were ongoing, Walsh and the Debtor continued to engage in contentious litigation, including the Debtor's filing of the Walsh Adversary Proceeding (as defined below) and the Circuit Court Appeal (as defined below).

Prior to the bankruptcy filing, the Debtor and Walsh were fighting in the Circuit Court, the Debtor's weld inspector, Calumet Testing Services ("*Calumet*"), and the City of Chicago placed

- 7 -

an aggregate of $3,800,000 with the Cook County Clerk of Court to satisfy the Debtor's claims against them (the "*Cook County Funds*"). The Debtor subsequently won judgment on its claims against Calumet and the City of Chicago, but the Circuit Court allowed Walsh to take the Cook County Funds in partial satisfaction of its judgment against the Debtor.

The Cook County Funds were not disbursed prior to the Debtor's bankruptcy filing, so the Debtor filed an adversary proceeding against Walsh seeking a turnover of the Cook County Funds (the "*Walsh Adversary Proceeding*"). The Bankruptcy Court ruled in favor of Walsh, holding that the Circuit Court judgment eliminated the Debtor's interest in the Cook County Funds. Thereafter, the Debtor sued Walsh for a preferential transfer of the Cook County Funds.

Meanwhile, both the Debtor and Walsh appealed the judgment of the Circuit Court (the "*Circuit Court Appeal*"). The Illinois Appellate Court ruled on September 28, 2018, awarding the Debtor the Calumet portion of the Cook County Funds in the amount of $1,812,696 and awarding Walsh the City of Chicago portion of the Cook County Funds in the amount of $1,554,654.

Upon the resolution of the Circuit Court Appeal, the Debtor and Walsh were able to reach a settlement: Walsh retained most of the Cook County Funds but subordinated any right to additional recovery to the Holders of other General Unsecured Claims until the Holders of other General Unsecured Claims receive payment equal to 10% of their allowed claim. The settlement also settled the Debtor's state court counsel's $400,000 attorneys' lien claim against the Debtor's estate, with the Debtor and Walsh each paying half of a significantly reduced amount to the Debtor's state court counsel to retire the lien. The Bankruptcy Court approved the settlement in its entirety by entry of the Walsh Settlement Order on December 19, 2018 [*Docket No. 580*].

Pursuant to the Walsh Settlement Order, various parties including Walsh and the Debtor's state court counsel each waived any and all right to object to a plan of liquidation proposed by the Debtor or the Committee and affirmatively agreed to Plan confirmation.

## G.    Adversary Proceedings

During the ninety (90) days prior to the filing of its Case, the Debtor disbursed over $9,000,000 to its Creditors. Following the sale of its assets to LB Metals, the Debtor and the Committee inspected these disbursements, determining that approximately $5,500,000 disbursed to twenty-five (25) different Creditors were preferential in nature, meaning that the disbursements improperly allowed such Creditors to recover most or all of the amounts owed to them while other Creditors received nothing during the same period. Before initiating litigation, the Debtor made reduced settlement offers to these Creditors, but only a few took advantage of the offers. The remainder of the Creditors insisted on being sued by the Debtor or the Committee, resulting in the filing of twenty adversary proceedings for the recovery of preferential transfers.

To date, the Debtor and the Committee have resolved ten of the filed adversary proceedings, resulting in a recovery of approximately $1,750,000 for the Debtor's estate. The bulk of the recovered funds were used to pay administrative claims pursuant to an order entered by the Bankruptcy Court on October 24, 2018 [*Docket No. 545*]. The remaining funds constitute the Debtor's Cash on Hand, totaling $143,345 as of April 30, 2019 [*Docket No. 604*].

- 8 -

Pursuant to the Plan, the Debtor and the Committee will continue to prosecute each of the remaining adversary proceedings (the "*Litigation Actions*") to Final Order, which may include a settlement approved by the Bankruptcy Court. All net recoveries from the prosecution of the Litigation Actions will be used to pay Class 1 and Class 2 Claims pursuant to the distribution scheme set out in the Plan.

Those remaining Litigation Actions include the following:

(i)      *LB Steel, LLC v. United States Steel Corp.*, Adversary Proceeding No. 16-00353, which is a suit seeking the disallowance of the claim of United States Steel Corporation and the recovery of $855,046.53 in preferential transfers.

(ii)     *LB Steel, LLC v. Keystone Consolidated Industries, Inc.*, Adversary Proceeding No. 16-00354, which is a suit seeking the disallowance of the claim of Keystone Consolidated Industries, Inc. and the recovery of $112,957.22 in preferential transfers.

(iii)    *LB Steel, LLC v. Steel Warehouse Quad Cities LLC*, Adversary Proceeding No. 16-00355, which is a suit seeking the disallowance of the claims of Steel Warehouse Quad Cities LLC and Steel Warehouse Company, LLC and the recovery of $433,217.45 in preferential transfers.

(iv)     *Official Committee of Unsecured Creditors of LB Steel, LLC v. Russel Metals Inc.*, Adversary Proceeding No. 17-00327, which is a suit seeking the disallowance of the claim of Russel Metals, Inc. and the recovery of $158,696.32 in preferential transfers.

(v)      *LB Steel, LLC v. Janco Steel Ltd.*, Adversary Proceeding No. 17-00339, which is a suit seeking the disallowance of the claim of Janco Steel Ltd. and the recovery of $571,943.63 in preferential transfers.

(vi)     *Official Committee of Unsecured Creditors of LB Steel, LLC v. Steelcast Ltd.*, Adversary Proceeding No. 17-00390, which is a suit seeking the disallowance of the claims of Steelcast Limited and Steelcast, LLC and the recovery of $252,393.00 in preferential and/or fraudulent transfers.

(vii)    *LB Steel, LLC v. CCL Construction Consultants, Inc.*, Adversary Proceeding No. 17-00468, which is a suit seeking the disallowance of the claim of CCL Construction Consultants, Inc. and the recovery of $42,401.65 in preferential and/or fraudulent transfers.

(viii)   *LB Steel, LLC v. Barsom Consulting, Ltd.*, Adversary Proceeding No. 17-00476, which is a suit seeking the disallowance of the claim of Barson Consulting, Ltd. and the recovery of $201,576.97 in preferential and/or fraudulent transfers.

(ix)     *LB Steel, LLC v. Garrett*, Adversary Proceeding No. 17-00481, which is a suit seeking the disallowance of the claims of Jeffrey L. Garrett and JLG Consulting LLC and the recovery of $182,525.00 in preferential and/or fraudulent transfers.

119236-0001.0001/143916861.4

(x)    *LB Steel, LLC v. D.L. McQuaid & Associates, Inc.*, Adversary Proceeding No. 17-00504, which is a suit seeking the disallowance of the claim of D.L. McQuaid & Associates, Inc. and the recovery of $76,563.88 in preferential and/or fraudulent transfers.

The remaining Litigation Actions seek aggregate recoveries of approximately $3,000,000 in preferential and/or fraudulent transfers.

## V.    OVERVIEW OF THE PLAN

The following is an overview of certain material provisions of the Plan, which is attached hereto as **Exhibit A**. The following summaries of the material provisions of the Plan do not purport to be complete and are qualified in their entirety by reference to the relevant provisions of the Plan, including all exhibits.

### A.    General Information Concerning Treatment of Claims and Interests

The Plan provides for satisfaction in full of the Allowed Priority Claims, which are unclassified and may neither vote to accept or reject the Plan. Votes on the Plan are not being solicited from holders of Class 3 Interests (Interests of Equity Security Holders) as such Interests will receive nothing under the Plan and are therefore deemed to have rejected the Plan. Those Creditors holding Class 1 Claims (General Unsecured Claims) and a Class 2 Claim (Walsh Claim) shall be entitled to vote to accept or reject the Plan.

The Plan provides distributions to Class 1 and Class 2 Claims in an amount that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. As a result, the Plan satisfies the Bankruptcy Code.

### B.    Summary of Distributions

The following table describes the treatment of Claims and Interests under the Plan.

| Class | Treatment | Impairment | Estimated Allowed Amounts Due | Estimated Percentage Recovery |
|---|---|---|---|---|
| Allowed Priority Claims (Unclassified) | 100% payment from Cash on Hand | Unclassified Not entitled to vote | Estimated $13,163 in Claims to be paid on the Effective Date of the Plan | 100% |
| Class 1 Claims (General Unsecured Claims) | Pro Rata share of the Net Proceeds from the Litigation Actions | Impaired Entitled to vote | Estimated $16,000,000 | 0 - 13.0% |
| Class 2 Claims (Walsh Claims) | Pro Rata share of the Net Proceeds from the Litigation Actions following the occurrence of the Distribution Event | Impaired Entitled to vote | $24,132,650 | 0 - 3.3% |

- 10 -

| Class | Treatment | Impairment | Estimated Allowed Amounts Due | Estimated Percentage Recovery |
|---|---|---|---|---|
| Class 3 Interests (Interests of Equity Security Holders) | Holders of these Interests will not receive a distribution under the Plan | Impaired Deemed to reject | N/A | 0% |

### C.    Assets and Liabilities

#### (i)    Assets

The only remaining known assets of the Debtor's estate are the Litigation Actions and its cash on hand.  In total, the Litigation Actions contain a potential recovery of approximately $3,000,000 in favor of the Debtor's estate.  As of January 31, 2019, the Debtor's cash on hand equaled $149,583.

#### (ii)    Liabilities

The Debtor estimates that it has the following liabilities:

**a.    Allowed Priority Claims**.[2]  Debtor will owe approximately $13,163 in accrued but unpaid Priority Claims, which amount represents the priority claim of The Ohio Department of Taxation [*Proof of Claim No. 172*].

**b.    Class 1 Claims**.  There are approximately $16,000,000 in unpaid General Unsecured Claims.  The Debtor and the Committee will file objections to disputed claims no later than one hundred eighty (180) days after the Effective Date (unless extended by order of the Bankruptcy Court).

**c.    Class 2 Claim**.  Walsh holds an allowed claim of $24,132,650.  The Walsh Claim has been allowed pursuant to the Walsh Settlement Order, but will not accrue interest, fees, or costs.

### D.    Implementation and Distribution

#### (i)    Prosecution of the Litigation Actions

The Debtor and the Committee will prosecute each of the remaining Litigation Actions to entry of a Final Order.  The Committee reserves the right to prosecute any and all objections or causes of action against insiders of the Debtor, including, without limitation, for the subordination

---

[2]    The Debtor's claim register additionally includes the misclassified claims of Cricket Transport Inc. [*Proof of Claim No. 47*], JLG Consulting LLC [*Proof of Claim No. 148*], and Topeka Metal Specialties [*Proof of Claim No. 53*], which erroneously list a portion of their claims as entitled to administrative priority or secured respectively.  The Debtor intends to file an objection to each of these claims, seeking the reclassification of each of these claims as General Unsecured Claims.

- 11 -

of their claims or to otherwise object to or challenge such claims, including, without limitation, the claims asserted by Michael Goich and Marija Goich.

To the extent the Debtor has any additional claims, rights, or Causes of Action, the Debtor, and the Committee shall have the right, authority, and discretion to institute, prosecute, abandon, settle, or compromise such claims, rights, or Causes of Action without the consent or approval of any third party and without further order of the Bankruptcy Court. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall apply to any claim, right, or Cause of Action based on the Disclosure Statement, this Plan, or the Confirmation Order, unless such claim, right, or Cause of Action is expressly waived, relinquished, released, compromised, or settled therein.

### (ii)    Distribution of Net Proceeds

Upon entry of Final Orders in each of the Litigation Actions, the Debtor shall be responsible for distribution of the Net Proceeds of the Litigation Action on a Pro Rata basis to the Holders of the Allowed Claims. The Debtor shall not be required to make a distribution of Net Proceeds until after all of the Litigation Actions have been resolved by entry of a Final Order. The Debtor may make, but shall not be required to make, any interim or final distributions on an Allowed Claim unless the amount of the distribution is twenty-five ($25.00) dollars or greater.

All distributions to any Holder of an Allowed Claim shall be made by the Debtor at the address of such Holder as set forth in the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor or its agents unless the Debtor has been notified in writing of a change of address, including by the filing of a proof of Claim.

Any distribution that has not cleared the recipient's bank within ninety (90) days of the date of distribution will lapse. Any lapsed distribution shall revert to the Debtor to be distributed to the remaining Holders of Allowed Claims, on a Pro Rata basis, in accordance with the terms of the Plan.

If any distribution to a Holder is returned as undeliverable, no further distributions to such Holder shall be made unless and until such distributions are claimed, at which time all missed distributions shall be made to the Holder without interest. Nothing in the Plan will require the Debtor to attempt to locate any Holder of an Allowed Claim

All demands for undeliverable distributions shall be made on or before three (3) months following entry of a Final Order in the last of the Litigation Actions. Thereafter, any remaining undeliverable distributions shall be consolidated and distributed to the remaining Holders of Allowed Claims on a Pro Rata basis in accordance with the terms of the Plan.

### (iii)    Rights of the Debtor

From the Effective Date and continuing through the date that a final decree closing the Case is entered pursuant to section 350 of the Bankruptcy Code and Bankruptcy Rule 3022, the Debtor and the Committee shall possess the rights of a party in interest for all matters arising in, arising under, or related to this Case. In addition to the foregoing, for all matters arising in, arising

- 12 -

under, or related to the Case, the Debtor and the Committee shall:  (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts of competent jurisdiction; (ii) be entitled to notice and the opportunity to be heard; (iii) be entitled to participate in all matters brought before the Bankruptcy Court, including adversary proceedings; (iv) have exclusive standing to commence any new Cause of Action; (v) be entitled to request the Bankruptcy Court enter a final decree closing the Case; and (vi) be entitled to receive notice of all applications, motions, and other papers and pleadings set before the Bankruptcy Court in this Case.

### (iv)    Management of the Debtor

Pursuant to the Bankruptcy Court order granting the application to retain and employ Development Specialists, Inc. ("*DSI*"), DSI shall continue to provide management services to the Debtor from the Effective Date and continuing through the date that a final decree closing the Case is entered.

### (v)    Occurrence of the Effective Date

The Effective Date shall occur upon the entry of the Confirmation Order by the Bankruptcy Court.  The Debtor shall file a notice of Effective Date.

### (vi)    Termination of the Committee

The Committee shall remain in existence until a Final Order has been entered closing the Debtor's Case.  Once entered, the Committee shall be dissolved, and its members shall be deemed released of their duties and responsibilities.

### (vii)    United States Trustee Fees

The Debtor shall continue to pay quarterly fees to the United States Trustee that have accrued and remain unpaid up to the Effective Date.  Following the Effective Date, the Debtor shall pay quarterly fees accrued during the post-Effective Date period to the United States Trustee.

### (viii)    Semi-Annual Reports

The Debtor shall prepare and file with the Bankruptcy Court a report within thirty (30) days after June 30 and December 31 of every calendar year following the Effective Date through the date that a final decree closing the Case (the "*Semi-Annual Report*").  The Semi-Annual Report shall set forth: (a) all distributions made during the period covered by such Semi-Annual Report; (b) all deposits made during the period covered by such Semi-Annual Report; and (c) a summary of the Debtor's assets.

### (ix)    Wind-Down and Case Closure

As soon as practicable, but not later than three months following entry of a Final Order in the last of the Litigation Actions, the Debtor shall provide for its orderly wind-down or dissolution under applicable state law.

- 13 -

The Case shall not be closed until a Final Order has been entered in all of the Litigation Actions.

### E.    Status of Executory Contracts and Administrative and Disputed Claims

#### (i)    Executory Contracts

Each executory contract or unexpired lease of the Debtor that has not expired by its own terms, been previously rejected by order of the Bankruptcy Court, or been assumed prior to the Confirmation Date shall be deemed rejected.

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to Section 3.1 of the Plan must be filed with the Bankruptcy Court by no later than thirty (30) days after the Confirmation Date.

#### (ii)    Administrative Claims

All Persons requesting payment of Administrative Claims shall file a proof of claim with the Bankruptcy Court no later than thirty (30) days after the Confirmation Date (the "*Administrative Claims Bar Date*").  The Administrative Claims Bar Date shall not apply to Professionals requesting payment of Professional Fee Claims.

#### (iii)    Disputed Claims

The Debtor and the Committee have standing to file objections to Claims and will file objections to Claims no later than one hundred eighty (180) days after the Effective Date.

### VI.    CONFIRMATION AND CONSUMMATION PROCEDURE

The Bankruptcy Court may confirm the Plan if it determines that the Plan complies with the requirements of the Bankruptcy Code, including that: (i) the Plan has properly classified Claims and Interests; (ii) the Plan was filed in good faith and not by any means forbidden by law; (iii) the Plan has been accepted by the requisite votes of all Classes of Creditors; (iv) the Plan is in the "best interests" of all Holders of Claims or Interests in an impaired Class; and (v) the Plan is "feasible".

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A.    Solicitation of Votes

Under the Bankruptcy Code, a class of claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of the claims properly voted in that class, voted to accept the Plan.  Under the Plan, the Holders of Class 1 Claims and the Class 2 Claim are entitled to vote to accept or reject the Plan.  Class 3 Interests are deemed under the Bankruptcy Code to have rejected the Plan.  This Disclosure Statement and an appropriate ballot are being distributed to all Holders of Claims who are entitled to vote on the Plan.

- 14 -

Any ballot that is properly completed, executed, and timely returned to the Debtor that does not indicate an acceptance or rejection of the Plan, or indicates both an acceptance and a rejection of the Plan, will be deemed to be a vote to accept the Plan. Whenever a Creditor casts more than one ballot voting the same Claim before the Voting Deadline, the last ballot received before the Voting Deadline is deemed to reflect the voter's intent and shall therefore supersede any prior ballots. Creditors must vote all of their Claims either to accept or reject the Plan and may not split their vote, and thus a ballot that partially accepts and partially rejects the Plan will not be counted.

### B.    The Joint Hearing

The Joint Hearing is scheduled for September 19, 2019, at 9:30 a.m. (Central Daylight Time) before the Hon. Janet S. Baer of the United States Bankruptcy Court at the United States Courthouse, 219 S. Dearborn St., Chicago, Illinois 60604. At the Joint Hearing, the Bankruptcy Court will consider whether the Disclosure Statement contains "adequate information" and the Plan satisfies the requirements of the Bankruptcy Code. Prior to the Joint Hearing, the Debtor will submit a report to the Bankruptcy Court reflecting the votes received with respect to the acceptance or rejection of the Plan.

Any party-in-interest may object to confirmation of the Plan. Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on all required parties on or before the Objection Deadline.

### C.    Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all the applicable requirements of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan: (i) has been accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (ii) is feasible; and (iii) is in the "best interests" of creditors and stockholders that are impaired under the plan and that vote, or are deemed, to reject the plan.

### (i)    Unfair Discrimination and Fair and Equitable Tests

To obtain confirmation of a plan over the objection of a class of claims or interests that rejects such plan, it must be demonstrated that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to each such non-accepting class. For a plan to be found to be "fair and equitable" and thus subject to confirmation by "cramdown," the Debtor must demonstrate:

**a.    For a Class of Unsecured Creditors**. That either: (i) each impaired unsecured creditor receives or retains, under the plan, property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

**b.    For a Class of Interests**. That either: (i) each holder of an interest will receive or retain, under the plan, property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such

- 15 -

holder is entitled or the value of the interest; or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan.

As described above, Holders of Class 3 Interests are presumed to have rejected the Plan. The Plan may be confirmed over the dissent of Class 3 Interests in view of the terms of the Plan. The Plan treatment of the Class 3 Interests satisfies the "fair and equitable" test because no Class junior will receive or retain any property under the Plan, and because the Class 2 Claim, whose Claim has priority over the Interests classified in Class 3, will share Pro Rata in the Net Proceeds of the Litigation Actions pursuant to the Plan.  In addition, the Plan does not unfairly discriminate against Class 3 Interests.

### (ii)    Best Interests Test and Liquidation Analysis

With respect to each impaired class of claims and interests, confirmation of a plan requires that each holder of a claim or interest either: (i) accept the plan; or (ii) receive or retain under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.  The Plan meets the "best interests of creditors" test of the Bankruptcy Code.  Members of each impaired Class will receive greater value under the Plan than they would in a chapter 7 liquidation proceeding.

Converting the Case to chapter 7 will result in substantial chapter 7 administrative costs and additional professional fees.  A chapter 7 trustee and his or her professionals will be required to devote considerable time to reviewing the substantial litigation and discovery files of the Debtor and the Committee that are prosecuting the Litigation Actions in an effort to get up to speed in those actions.  The Debtor and the Committee benefit from the financial analysis of the Debtor's CRO, who will also be serving as their expert witness in the Litigation Actions.  Installing a chapter 7 trustee at this stage of the Litigation Actions would slow their resolution and likely result in a 10-20% reduction in the net recovery of the Litigation Actions due to chapter 7 trustee's increased professional fees and statutory chapter 7 trustee fees.

The Plan will provide a greater recovery than under chapter 7 due to the value the Debtor and the Committee can bring to the estate with their historical knowledge of the Debtor's business and the Litigation Actions, which will aid in reconciling overstated and invalid Claims and in assuring recoveries from the prosecution of the Litigation Actions.

Additionally, although a chapter 7 trustee will likely vigorously pursue claim objections and the Litigation Actions, such a result is highly speculative because the pursuit of such litigation is not a precondition to the appointment of a chapter 7 trustee, and the chapter 7 trustee may ultimately choose not to challenge the Claims or to prosecute the Litigation Actions.

For the foregoing reasons, the Plan, as proposed, meets each of the requirements for confirmation pursuant to section 1129 of the Bankruptcy Code.

### VII.    TAX CONSEQUENCES

U.S. TREASURY CIRCULAR 230 DISCLOSURE:  TO ENSURE COMPLIANCE WITH U.S. TREASURY CIRCULAR 230, EACH HOLDER OF A CLAIM OR AN INTEREST

- 16 -

IS HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM OR AN INTEREST FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER OF A CLAIM OR AN INTEREST UNDER TITLE 26 OF THE UNITED STATES CODE (THE "*TAX CODE*"); (II) SUCH DISCUSSION IS FOR THE PURPOSE OF SOLICITATION OF VOTES ACCEPTING THE PLAN; AND (III) A HOLDER OF A CLAIM OR AN INTEREST SHOULD SEEK ADVICE BASED UPON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### A.    General

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the transactions proposed in the Plan for the Debtor and for the Holders of Claims and Interests. The summary is provided for information purposes only and is based on the Tax Code, the Treasury regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effects that could adversely affect the federal income tax consequences described below.

The summary does not address all aspects of federal income taxation that may be relevant to a particular Holder of a Claim in light of its particular facts and circumstances or to certain types of Holders of Claims subject to special treatment under the Tax Code (for example, non-U.S. taxpayers, financial institutions, broker-dealers, life insurance companies and tax-exempt organizations). The summary also does not discuss any aspects of state, local or foreign tax consequences.

In addition, a substantial amount of time may elapse between the Confirmation Date of the Plan and the receipt of a final distribution under the Plan. Events subsequent to the date of this Disclosure Statement, such as additional tax legislation, court decisions or administrative changes, could affect the federal income tax consequences of the Plan and the transactions contemplated thereunder. No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan and no opinion of counsel has heretofore been obtained by the Debtor with respect thereto. Accordingly, each Holder of a Claim or Interest is strongly urged to consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan to such Holder.

### B.    Federal Income Tax Consequences to the Debtors

Under the Plan, the Debtor's outstanding indebtedness will be satisfied in exchange for cash. The satisfaction of a debt obligation for an amount of cash and other property having a fair market value less than the debt obligation generally gives rise to cancellation of indebtedness ("*COD*") income to a debtor. However, with the exception noted below, the Debtor will not recognize COD income because the debt discharge occurs in a bankruptcy case. The Debtor will instead, to the extent available, reduce its tax attributes to the extent of its COD income in the following order: (i) net operating losses; (ii) general business credit carryforwards; (iii) minimum tax credit carryforwards; (iv) capital loss carryforwards; and (v) the tax basis of the Debtor's

- 17 -

depreciable and nondepreciable assets (but not below the amount of its liabilities immediately after the discharge).

The Debtor may elect to alter the preceding order of attribute reduction and, instead, first reduce the tax basis of its depreciable assets. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (i.e., such attributes may be available to offset taxable income that accrues between the date of discharge and the end of the Debtor's tax year). The Debtor does not recognize any COD income that exceeds the amount of available tax attributes, and such excess COD income has no other U.S. federal income tax effect

As a result of the above, the Debtor does not expect to incur any substantial tax liability as a result of implementation of the Plan.

### C.    Federal Income Tax Consequences to Holders of Allowed Claims

The federal income tax consequences of the implementation of the Plan to Holders of Allowed Claims will depend on, among other things, the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder receives distributions under the Plan in more than one taxable year, whether the Holder's Claim is an Allowed Claim on the Effective Date, and whether the Holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim.

In general, a Holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the Holder's tax basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the Holder, the length of time the Holder held the Claim, and whether the Claim was acquired at a market discount. If the Holder realizes a capital loss, the Holder's deduction of the loss may be subject to limitation. The Holder's tax basis for any property received under the Plan generally will equal the amount realized. The Holder's amount realized generally will equal the sum of the cash and the fair market value of any other property received by the Holder under the Plan on the Effective Date or a subsequent distribution date, less the amount (if any) treated as interest, as discussed below.

Because certain Holders of Allowed Claims may receive cash distributions after the Effective Date, the imputed interest provisions of the Tax Code may apply and cause a portion of the subsequent distributions to be treated as interest. Additionally, because Holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the Holder may be deferred. All Holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

Holders of Allowed Claims will recognize ordinary income to the extent that they receive cash under the Plan. If an Allowed Claim includes interest, and if the Holder receives less than the amount of the Allowed Claim pursuant to the Plan, the Holder must allocate the Plan consideration between principal and interest. Holders of Allowed Claims are strongly urged to consult their own tax advisors in this regard. If the Plan consideration allocable to interest with

- 18 -

respect to an Allowed Claim is less than the amount that the Holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally at a loss.

A Holder who receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the Tax Code or a worthless securities deduction under section 165(g) of the Tax Code. The rules governing the character, timing, and amount of bad debt and worthless securities deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### D.    Income Reporting and Withholding

Under the Tax Code's backup withholding rules, the Holder of an Allowed Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the Holder comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. Holders of Allowed Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### E.    Federal Income Tax Consequences to Holders of Interests

Under the Plan, Holders of Interests will not receive anything on account of such Interest. A Holder of such Interest will recognize loss in an amount equal to such Holder's adjusted tax basis in the Interest. The character of any recognized loss will depend upon several factors, including, but not limited to, the status of the Holder, the nature of the Interest in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period, and the extent to which the Holder had previously claimed a deduction for the worthlessness of all or a portion of the Interest.

There are many factors that will determine the tax consequences to each Holder of an Interest. Furthermore, the tax consequences of the Plan are complex and, in some case, uncertain. Therefore, it is important that each Holder of an Interest obtain its own professional tax advice regarding the tax consequences to such holder of an Interest as a result of the Plan.

### F.    Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES.

- 19 -

ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## VIII.   RISK FACTORS

Holders of Claims and Interests against the Debtor should read and consider carefully the information set forth below, as well as other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan.  This information, however, should not be regarded as necessarily setting forth the only potential risks involved in connection with the Plan and its implementation.

### A.    Failure To Satisfy Vote Requirement

In the event that sufficient votes accepting the Plan are not received and, as a result, the Court denies confirmation of the Plan, the Debtor will assess the alternatives available to it, including: (i) amending the Plan; or (ii) converting this Case to a chapter 7 liquidation proceeding. There is substantial risk that either of these alternatives will result in less favorable treatment of Claims and Interests than is provided in the Plan.

### B.    Non-Consensual Confirmation

In the event any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm such Plan if at least one impaired Class of Claims has accepted the Plan (with such acceptances being determined without including the vote of any "insider" in such Class), and, as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting impaired Class(es).  The Plan satisfies these requirements, although there can be no assurances that the Bankruptcy Court will make the findings necessary to reach this result.

### C.    Amount of Allowed Claims

The total amount of all Claims filed in the Case may materially differ from the estimated amounts of Allowed Claims.  Accordingly, the amount and timing of the distributions that will ultimately be received by any particular Holder of an Allowed Claim in any Class may be materially and adversely affected if the estimates are exceeded as to any Class.

## IX.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION

The Plan affords Holders of Claims the potential for the greatest recovery and, therefore, is in the best interests of such holders.  The Plan as presented is the result of considerable negotiations between the Debtor and the Committee.

### A.    Chapter 7 Liquidation of the Debtor

If no plan is confirmed, the Debtor may be forced to liquidate under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the

Debtor's assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims against or Interests in the Debtor.

In a liquidation under chapter 7, before Creditors receive any distribution, additional administrative expenses related to the appointment of a trustee and the trustee's attorneys, accountants, and other professionals would cause a substantial diminution in the value of the Debtor's estate.  The assets available for distribution to Creditors would be reduced by such additional expenses and by claims, some of which would be entitled to priority.  Creditors would receive *de minimis* distributions on their Claims in a liquidation.

## X.      CONCLUSION

Under the Plan, Holders of Class 1 and Class 2 Claims have an opportunity to receive a meaningful recovery on their Claims, while at the same time avoiding the additional fees and expenses that would be incurred upon conversion to chapter 7.  Therefore, the distributions provided for in the Plan are fair and equitable, and the Debtor and the Committee strongly recommend acceptance of the Plan.

If you are eligible to vote on the Plan, please do so now by completing and returning the enclosed ballot.

Dated this 8th day of July 2019.


| | |
|---|---|
| LB STEEL, LLC | THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LB STEEL, INC. |
| By: /s/ *David J. Gold* | By: /s/ *Rosanne Ciambrone* |
| Its Counsel | Its Counsel |
| Daniel A. Zazove (ARDC No. 3104117) | Rosanne Ciambrone (ARDC No. 6199456) |
| David J. Gold (ARDC No. 6299872) | Richard P. Darke (ARDC No. 6255810) |
| **PERKINS COIE LLP** | **DUANE MORRIS LLP** |
| 131 S. Dearborn St., Ste. 1700 | 190 S. LaSalle St., Ste. 3700 |
| Chicago, Illinois 60603 | Chicago, Illinois 60603 |
| Telephone: (312) 324-8400 | Telephone: (312) 499-6700 |
| Facsimile: (312) 324-9400 | Facsimile: (312) 499-6701 |
| dzazove@perkinscoie.com | rciambrone@duanemorris.com |
| dgold@perkinscoie.com | rpdarke@duanemorris.com |
| *Counsel to the Debtor* | *Counsel to the Official Committee of Unsecured Creditors of LB Steel, LLC* |

- 21 -